**Elena L. JORDAN, Appellant,**

v.

**David A. JORDAN, Appellee.**

**Nos. 09–FM–1152, 09–FM–1337, 10–FM–375.**

District of Columbia Court of Appeals.

Argued Nov. 12, 2010.
Decided March 10, 2011.

Joan S. Meier, Domestic Violence Legal Empowerment and Appeals Project (DV LEAP), with whom Elizabeth S. Liu, DV LEAP, and Avery E. Roselle, Washington, DC, were on the brief, for appellant in appeal Nos. 09–FM–1152 and 09–FM–1337.

Kerri L. Ruttenberg, with whom Danielle M. Hohos, Washington, DC, and Joan S. Meier, DV LEAP, were on the brief, for appellant in appeal No. 10–FM–375.

Gail B. Landau, Rockville, MD, for appellee in appeal Nos. 09–FM–1152, 09–FM–1337, and 10–FM–375.

Caroline Judge Mehta, Washington, DC, Kenneth E. Noyes, and Sue Ryan, on behalf of amici curiae, New York Legal Assistance Group, InMotion, Justice for Children, Women's Justice Center at Pace University School of Law, Legal Services NYC, D.C. Coalition Against Domestic Violence, and Women Empowered Against Violence, Inc., filed a brief in support of appellant in appeal No. 09–FM–1152.

Margaret J. McKinney, Kristin Henrikson, Bethesda, MD, and Samantha H. Kravitz, on behalf of amicus curiae, the Bar Association of the District of Columbia, filed a brief in support of neither party in appeal No. 10–FM–375.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and PAN, Associate Judge, Superior Court of the District of Columbia.[*]

PAN, Associate Judge, Superior Court of the District of Columbia:

After an 11–year marriage, appellant Elena L. Jordan and appellee David A. Jordan divorced in May 2009. These consolidated appeals arise from the ensuing proceedings to determine custody arrangements for the parties' two daughters. Following a highly contentious custody trial that spanned nine days in July and August of 2009, the trial court awarded joint legal and physical custody to Ms. Jordan and Mr. Jordan. Because the parties were unable to reach decisions together amicably, the trial court appointed a "parenting coordinator" to mediate and resolve any disputes concerning the children. Ms. Jordan appeals both the award of joint custody and the appointment of the parenting coordinator. She argues that the trial court did not adequately consider allegations and findings of domestic violence when it granted joint custody to Mr. Jordan, and that the trial court did not have authority to appoint a parenting coordinator over her objection. For the reasons discussed *infra*, we affirm the judgment of the trial court with respect to the award of joint custody and the appointment of a parenting coordinator.

## I. Background

Ms. Jordan and Mr. Jordan met while they were both graduate students at Vanderbilt University in Tennessee. They were married in 1997 in Russia, relocated to Maryland in 1999, and have resided in the District of Columbia since 2001. Both are employed professionals with masters degrees in business, and each has substantial income that is roughly equal to the other's. The parties have two daughters: E.J., who is now 12 years old; and A.J., who is now five years old.

The trial court characterized the parties' marriage as "fraught with conflict." Nevertheless, during the marriage, "[t]he relationships between the girls and both parents were normal and equal." On August 12, 2008, Mr. Jordan asked for a divorce, and he moved out of the family's home about two weeks later. Thereafter, on September 29, 2008, Mr. Jordan agreed to a consent civil protection order without admissions, under which he was required to stay away from Ms. Jordan.

After the parties separated, E.J. and A.J. resided with Ms. Jordan and had visits with Mr. Jordan. As the dissolution of the marriage devolved into "a high conflict situation," the relationship between Mr. Jordan and his daughters deteriorated. Due to the proceedings related to the civil

---

[*] Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

protection order, Mr. Jordan did not see the children for approximately three weeks. Subsequently, during the girls' first overnight visit with Mr. Jordan on October 3, 2008, E.J. contacted Ms. Jordan to complain that Mr. Jordan had shaken her. Ms. Jordan called the police and a child-abuse hotline, and went to Mr. Jordan's residence. The police did not arrest Mr. Jordan and allowed the children to remain with him. A social worker from Child Protective Services investigated the incident. She concluded that E.J.'s allegations were "unfounded" and that E.J. appeared "to be coached or otherwise influenced."

Thereafter, interactions between E.J. and Mr. Jordan were strained. E.J. developed "an unhealthy enmeshment" with her mother and was unable to distinguish her own needs from those of Ms. Jordan. E.J. was privy to adult information about the relationship between her parents, how her father behaved, and how her mother felt about the situation. Meanwhile, Ms. Jordan did not understand how her actions affected E.J. As a result, E.J.'s perceptions of Mr. Jordan became distorted, and she became "alienated" from her father. She "challenge[d] and degrade[d]" Mr. Jordan during visits, asserted that she wanted no contact with him, and refused to speak to him during court-ordered reunification therapy. E.J. pressured A.J. to treat Mr. Jordan the same way, and "glare[d]" at A.J. if she did not comply. A.J. was confused. She wanted to spend

time with her father, but she sought E.J.'s approval. When A.J. was alone with Mr. Jordan, she was "loving and affectionate" with him; but she copied E.J.'s behavior when E.J. was present. A.J. became "trapped" by the conflicting signals sent by her family members. She manifested speech problems and a delay in learning the English language.[1]

During the pendency of the proceedings in the trial court, the court implemented a visitation plan under which the girls had overnight visits with Mr. Jordan every other weekend and regular contact with him during the week. E.J. spent much of her time during the visits with her father sending text messages to Ms. Jordan and refusing to engage with Mr. Jordan. A.J. parroted E.J.'s behavior. When the court adjusted the schedule to allow each girl to spend time alone with Mr. Jordan, A.J. had successful overnight visits with Mr. Jordan, but E.J.'s contact with Mr. Jordan dwindled to one therapy session and one additional encounter per week. For her part, Ms. Jordan was unable to support the goal of reunification for E.J. and Mr. Jordan; and Ms. Jordan tried to "fire" the reunification therapist who was working with them.[2]

During the custody trial, the court heard testimony about "several violent episodes." The court found that during two of these episodes, Mr. Jordan committed intrafamily offenses under D.C.Code § 16–1001(8) (2001).[3] The first intrafamily offense occurred in July 2005, when the parties got

---

1. A.J. spent much of her time at home in the company of her maternal grandparents, who speak only Russian.

2. Both Ms. Jordan and Mr. Jordan contributed to the problems in their relationship. The trial court found that Ms. Jordan "is defensive, has trouble dealing with emotions, is controlling, has a narrow focus, and puts up walls between the children [and Mr. Jordan]." Mr. Jordan "is also controlling, but more flexible than [Ms. Jordan]." He "is frustrat-

ed, does not handle emotions well and is more likely to lose his temper than most people."

3. Under D.C.Code § 16–1001(8), an intrafamily offense is defined as "interpersonal, intimate partner, or intrafamily violence." Violence in this context includes "an act punishable as a criminal offense that is committed or threatened to be committed by an offender upon a person" with whom the of-

into an argument over some chicken that Mr. Jordan had picked up for dinner. Mr. Jordan "lost his temper, grabbed [Ms. Jordan's] upper arms and shook her ... us[ing] enough pressure to bruise her right triceps." The second offense occurred on August 3, 2008, during an argument about cleaning the kitchen. Mr. Jordan "put a dish towel around the back of [Ms. Jordan's] neck while the parties argued face to face." The trial court acknowledged that it had heard testimony about other "incidents where [Mr. Jordan had] lost his temper" but found that those incidents "do not fall within the definition of domestic violence in the District of Columbia."

Other evidence in the record provided additional information about the instances of violence. Dr. William B. Zuckerman, a licensed clinical psychologist, was appointed by the court to conduct a custody evaluation.[4] Dr. Zuckerman opined that the type of domestic violence perpetrated by Mr. Jordan was "situational"; that the incidents were "the type of interparental conflict that sometimes occurs amidst the intense emotion accompanying family dissolution"; and that the prior actions were not a predictor of future violence by Mr. Jordan. Dr. Zuckerman characterized Mr. Jordan's behavior as domestic "violence with a small v"; and asserted that "there is nothing in Mr. Jordan's history or test material which would suggest that he is any more likely than most to be a danger to others, nor is he likely to be inordinately neglectful." Furthermore, Dr. Zuckerman commented that "whatever shortcoming existed in Mr. Jordan's ability

to parent ..., his warm and positive qualities predominate, and by all accounts, until the separation, he enjoyed a reasonable relationship with both daughters."

Dr. Zuckerman also reported that he had solicited input from Dr. Ruth Zitner, the psychologist who had engaged in family-reunification therapy with Mr. Jordan and E.J. Dr. Zitner had opined that "[r]ather than presenting as abusive ... [Mr. Jordan] ... seem[ed] ... quite passive"; and that Mr. Jordan did "not [give] any impression whatsoever that he could have behaved in a way that has been seriously threatening to either [Ms.] Jordan or [E.J.]." At trial, Dr. Zitner testified that the parties "had some discrete episodes where they fought and did get physical, but that this was not a family in which there was domestic violence." Other mental-health professionals consulted by Dr. Zuckerman also agreed that Mr. Jordan did not pose a danger to Ms. Jordan or his daughters: (1) Dr. Yulia Aleshina, a clinical psychologist who had treated E.J., stated that she did not feel that Mr. Jordan "is in any way dangerous to his daughter"; (2) Jonah Green, a social worker who had worked with the parties as a "reunification therapist," stated that he "did not view Mr. Jordan as a dangerous individual"; and (3) Dr. Martha Gibbons, a clinical psychologist who saw Mr. Jordan in individual therapy, stated that she "did not notice anything that would be suggestive of difficulty managing impulses or anger," and that Mr. Jordan actually "can sometimes be too passive in the pursuit of his goals."

Ultimately, Dr. Zuckerman found both parents to be fit and recommended joint

---

fender has a familial or other intimate relationship. *See* D.C.Code § 16–1001(6) (interpersonal violence), § 16–1001(7) (intimate partner violence), and § 16–1001(9) (intrafamily violence).

4. Dr. Zuckerman prepared a detailed, 73-page report that documented his work and his

recommendations. During the custody evaluation, Dr. Zuckerman interviewed both parties and their children, as well as numerous other people who interact with the family. He also conducted home visits to observe each party with the children, and performed psychological tests on the parties.

legal and physical custody of the children.[5] Dr. Zuckerman stressed that the children need "to have positive connections with both parents and to be protected from conflict in the post divorce period." He further emphasized that it is "strongly in E.J.'s best interests to redevelop a good relationship with her father." To facilitate the joint-custody arrangement, Dr. Zuckerman recommended the appointment of a "parenting coordinator." He noted that the parties would need to make significant changes in their attitudes to promote the children's interests, and that the "most important developments" would center around Ms. Jordan, in helping her to normalize E.J.'s relationship with Mr. Jordan. Dr. Zuckerman contemplated that the parenting coordinator would work with the parties "[to create] a plan that would promote the relationships between Mr. Jordan and [his] daughters"; and that the parenting coordinator "should be endowed with authority to speed up or slow down the progress."

On August 21, 2009, the trial court issued its order awarding joint legal and physical custody to the parties. The court recognized that the separation and divorce had caused "great pain" for the entire family; that the children were "under great stress"; and that "[t]he current situation portends to result in serious emotional consequences for [E.J.] and [A.J.]." Acknowledging that its findings that Mr. Jordan had committed two intrafamily offenses against Ms. Jordan gave rise to a rebuttable presumption against awarding custody to Mr. Jordan, under D.C.Code § 16–914(a)(2),[6] the court nevertheless determined that the presumption was rebutted. In so finding, the court noted that E.J. is alienated from Mr. Jordan; that A.J. is in danger of becoming alienated; and that "this alienation portends serious emotional damage for both children." The court emphasized that the children's alienation from Mr. Jordan could "interfere with their emotional development, ... restrict their ability to develop healthy attachments in the future, ... affect their self-esteem and how they relate to the world around them, ... [and] increase the possibility of mental health issues." The court then considered seventeen factors relevant to determining the best interest of a child, as enumerated in D.C.Code § 16–914(a)(3).[7] One of the factors that

**5.** The trial court gave great weight to Dr. Zuckerman's report, noting that the characterizations in the report were "objective and fair" and that the language used was "balanced[, ...] impartial[, and] neutral."

**6.** D.C.Code § 16–914(a)(2) provides, in relevant part:

Unless the court determines that it is not in the best interest of the child, the court may issue an order that provides for frequent and continuing contact between each parent and the minor child or children and for the sharing of responsibilities of child-rearing and encouraging the love, affection, and contact between the minor child or children and the parents regardless of marital status. There shall be a rebuttable presumption that joint custody is in the best interest of the child or children, except in instances where a judicial officer has found by a preponderance of the evidence that an in-

trafamily offense as defined in § 16–1001(8) ... has occurred. There shall be a rebuttable presumption that joint custody is not in the best interest of the child or children if a judicial officer finds by a preponderance of the evidence that an intrafamily offense as defined in § 16–1001(8) ... has occurred.

**7.** D.C.Code § 16–914(a)(3) provides:

In determining the care and custody of a child, the best interest of the child shall be the primary consideration. To determine the best interest of the child, the court shall consider all relevant factors, including, but not limited to:

(A) the wishes of the child as to his or her custodian, where practicable;

(B) the wishes of the child's parent or parents as to the child's custody;

(C) the interaction and interrelationship of the child with his or her parent or parents,

the court explicitly discussed was "evidence of an intrafamily offense." The court acknowledged that such evidence was in the record, and stated, "[t]here is also evidence to rebut the presumption against joint legal custody as a result of that intra-family violence."

The court's findings in the August 21, 2009, custody order were buttressed by the trial judge's comments at the close of the trial on August 6, 2009. On that day, the court heard closing arguments and made preliminary rulings from the bench. At that point, the trial judge stated:

> In deciding whether [the presumption against joint custody] has been rebutted, I look at [the] totality of the circumstances surrounding the situation. I consider the testimony of the witnesses, the contents of the exhibits, and the information set forth in the report that has been admitted. I do find that the presumption has been rebutted because the situation here for these two girls, with things being as they are and the, frankly, emotional damage that they are suffering, combined with the efforts that Mr. Jordan has taken to rectify the conduct that led to that inappropriate behavior on his part—and let there be no doubt that it was inappropriate—rebuts the presumption. . . .

The court's order granting joint custody to the parties was "subject to" detailed provisions regarding therapy, schooling, and the apportionment of various expenses. In addition, the court found that the parties "are not able to reach joint decisions regarding the children," and thus required the parties to "use a Parenting Coordinator to assist them in making parenting decisions." The order provided that "[w]hen the parties are unable to reach a joint decision, the Parenting Coordinator will make the final determination on any issue"; and that "[t]he Parenting Coordinator will have the discretion to delegate tie-breaking authority on any issue to either parent." The order further provided that the parties would share the cost of the parenting coordinator; but if Ms. Jordan were unable to pay her share, Mr. Jordan would pay it for her and offset that cost against Ms. Jordan's monthly child-support payments. With respect to visitation, the court's order specified that E.J. would see Mr. Jordan twice a week, including one session of family-reunification therapy, with visits to "increase at the discretion of the Parenting Coordinator in consultation with the therapist providing family reunification therapy for [E.J.] and [Mr. Jordan]." A.J. was to eventually transition to a "5:2/2:5" format, in which she would spend every Monday and Tues-

his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest;
(D) the child's adjustment to his or her home, school, and community;
(E) the mental and physical health of all individuals involved;
(F) evidence of an intrafamily offense as defined in section 16–1001(5) [now § 16–1001(8)];
(G) the capacity of the parents to communicate and reach shared decisions affecting the child's welfare;
(H) the willingness of the parents to share custody;
(I) the prior involvement of each parent in the child's life;
(J) the potential disruption of the child's social and school life;
(K) the geographic proximity of the parental homes as this relates to the practical considerations of the child's residential schedule;
(L) the demands of parental employment;
(M) the age and number of children;
(N) the sincerity of each parent's request;
(O) the parent's ability to financially support a joint custody arrangement;
(P) the impact on Temporary Assistance for Needy Families, or Program on Work, Employment, and Responsibilities, and medical assistance; and
(Q) the benefit to the parents.

day with Ms. Jordan and every Wednesday and Thursday with Mr. Jordan and would alternate weekends with each party.

Ms. Jordan filed a motion for reconsideration of the custody order on September 9, 2009, which the trial court denied. Ms. Jordan promptly filed notices of appeal for both the custody order and the denial of her motion to reconsider. Her appeals related to the custody order do not include any challenge to the appointment of a parenting coordinator.

On October 7, 2009, Mr. Jordan filed a Motion to Enforce Judgment for Contempt and Other Relief, which asserted that Ms. Jordan had stated that she would "not select or use a Parenting Coordinator," in defiance of the trial court's custody order. Mr. Jordan asked for the court either to hold Ms. Jordan in contempt, to enjoin her from refusing to select a parenting coordinator, or to appoint one of three individuals suggested by Mr. Jordan's counsel. Ms. Jordan filed a *pro se* opposition to Mr. Jordan's motion on October 21, 2009, in which she disputed some of the factual allegations, proffered additional facts, and requested an evidentiary hearing.

At a hearing on December 29, 2009, Ms. Jordan questioned the court's authority to appoint a parenting coordinator. She also objected to the court's order that she either pay for half the costs of the parenting coordinator or have the expenses deducted from her child-support payments. After concluding the hearing, the trial court issued two orders. The first appointed Ms. Roberta Eisen as the parties' parenting coordinator. The second order, entitled "Order Appointing Special Master," was submitted for the court's signature by Mr. Jordan's counsel, who explained that it was

a form order that Ms. Eisen had provided for the court to use if she were appointed. This form order, hereinafter referred to as the "Special Master Order," contained the substantive provisions at issue in this appeal.

The Special Master Order appoints Ms. Eisen, a licensed professional counselor with extensive experience in the field, as "the Parent Coordinator/Special Master," and does so "[p]ursuant to Super. Ct. Dom. Rel. R. 53." The order describes the parenting coordinator as a "quasi-judicial officer," who "shall assist the parties in making parenting decisions for their children," and shall "develop ... a comprehensive parenting plan ... including ... a child-centered decision-making process that will enable the parties to make joint decisions." The order further provides that "[w]hen the parties are unable to make a joint decision, the Special Master shall make the final determination on any issue." The order permits the parenting coordinator to "make decisions resolving day-to-day conflicts between the parties that do not affect the court's exclusive jurisdiction to determine[ ] fundamental issues of custody and visitation." Moreover, it provides that "[n]othing in this order shall be construed to be or confer on the Special Master the right or obligation to conduct a custody evaluation ... [or] to make decisions that conflict with the parties' rights to make decisions regarding the children's religion or the children's observation of religious requirements."

The Special Master Order lists eleven categories of "day-to-day" issues, including logistical problems related to the residential custody schedule, clothing, and recreation.[8] The order states that, "in the

---

8. More specifically, the day-to-day issues listed in the order include:
 Logistical problems related to the residential schedule or vacations and holidays; [d]ates, time and method of pick up and

delivery, including which party shall be responsible for the same and the parties' conduct during the same; [t]ransportation to and from the parties' homes; [s]chool, daycare or camp attendance and homework

event of a dispute between the parties," the parenting coordinator "may make decisions" regarding these "day-to-day issues," and that the parenting coordinator "shall reduce any such decisions to writing." The order further states that "[e]ach party specifically agrees that decisions of the Special Master ... are effective as if they were court orders ... and [that they] will continue in full force and effect unless modified or set aside.... If either party disagrees with any order thus made, then he or she may make a timely motion requesting judicial intervention."

Ms. Jordan filed motions to reconsider both of the trial court's orders concerning the special master/parenting coordinator. She argued, *inter alia,* that "there is no authority in any statute, rule, or case that gives the Court the power to appoint a Parenting Coordinator." The trial court denied both of Ms. Jordan's motions to reconsider. Ms. Jordan appealed the orders appointing the parenting coordinator, as well as the order denying the motions to reconsider.

## II. The Custody Order

Ms. Jordan's challenges to the custody order all appear to be rooted in the belief that the trial court failed to give appropriate weight to the evidence in the record that Mr. Jordan was a perpetrator of domestic violence. Primarily, Ms. Jordan asserts that the court erred in awarding joint custody to Mr. Jordan without specifically citing and applying D.C.Code § 16–914(a–1) (2001), which requires a court to make particular findings regarding the safety and emotional well-being of the children before awarding custody or visitation to a party who has committed an intrafamily

offense. Ms. Jordan also argues that (1) although the trial court found that Mr. Jordan had committed two intrafamily offenses, the court failed to make factual findings regarding certain additional crimes allegedly committed by Mr. Jordan against Ms. Jordan and E.J.; and (2) the court erred in finding that the presumption against joint custody was rebutted by evidence that E.J. was "alienated" from Mr. Jordan. We conclude that each of these claims of error lacks merit.

### A. Standard of Review

■■■ "[W]e will only reverse a trial court's order regarding child custody upon a finding of manifest abuse of discretion." *Hutchins v. Compton,* 917 A.2d 680, 683 (D.C.2007) (internal quotations and citations omitted). Moreover, "[t]rial court rulings come to us with a presumption of correctness." *Id.* But the trial court's use of judicial discretion must be grounded "upon correct legal principles and must rest on a firm factual foundation." *Wilkins v. Ferguson,* 928 A.2d 655, 666–67 (D.C.2007) (citing *In re T.L.,* 859 A.2d 1087, 1090 (D.C.2004)). We review a trial court's legal determinations *de novo* but apply a clearly erroneous standard to its findings of fact. *See* D.C.Code § 17–305(a) (2001) (providing that the trial court's judgment "may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it"); *Wilkins,* 928 A.2d at 666.

### B. Analysis

■■ Ms. Jordan asserts that the custody order must be reversed because the

---

schedule and completion, if applicable; [t]he setting of daily consistent routines to be applied in both homes such as administration of medicine or other recommended actions by a treating physician or psychiatrist; meal times, bedtime, homework and other academic enrichment or extracurricular activities; [c]lothing; [r]ecreation; [l]imit-setting and discipline; and [m]anner and schedules of communication between the children and each parent without regard to the residential schedule.

trial court failed to comply with D.C.Code § 16–914(a–1). That statute provides:

> [I]f the judicial officer finds by a preponderance of evidence that a contestant for custody has committed an intrafamily offense, any determination that custody or visitation is to be granted to the abusive parent shall be supported by a written statement by the judicial officer specifying factors and findings which support that determination. In determining visitation arrangements, if the judicial officer finds that an intrafamily offense has occurred, the judicial officer shall only award visitation if the judicial officer finds that the child and custodial parent can be adequately protected from harm inflicted by the other party. The party found to have committed an intrafamily offense has the burden of proving that visitation will not endanger the child or significantly impair the child's emotional development.

Ms. Jordan argues that the trial court failed to cite § 16–914(a–1), and neglected to make the required findings that (1) Ms. Jordan and the children could be adequately protected from harm by Mr. Jordan, and (2) joint custody would not endanger or significantly impair the children's emotional development.[9] Relying on *Wilkins v. Ferguson*, 928 A.2d at 670, Ms. Jordan asserts that the omission of any reference to this applicable statutory provision necessitates an automatic reversal. Although it is true that the trial court did not discuss § 16–914(a–1), we think it is clear on this record that the trial court fully considered the evidence of domestic violence, and made implicit findings that comply with the requirements of the statute.

In *Wilkins*, a trial court granted unsupervised visitation with a three-year-old child to her father, despite having previously found that the father had committed intrafamily offenses by physically abusing the child's mother and by touching the child inappropriately. 928 A.2d at 658. Although visitation with the father had been suspended immediately after the court found that he had touched the child inappropriately, the court later modified its order to allow unsupervised visits. *Id.* at 659. Thereafter, the child asserted that her father had sexually abused her during the unsupervised visits. The child's mother requested a civil protection order, *id.* at 660, and later filed a motion to modify the trial court's custody determination, *id.* at 661. The mother sought to suspend visitation until the father successfully completed therapy, and sought to permit subsequent visitation only with supervision. *Id.* at 661–62. The trial court heard substantial evidence in connection with ruling on these requests, including the testimony of doctors who had conducted psychological evaluations of the parents and the child. *See id.* at 661–64. Significantly, no expert or health professional who became familiar with the case recommended unsupervised visits with the father. *Id.* at 670. Nevertheless, the court granted the father unsupervised visitation. *Id.* at 664. In so doing, the trial court focused only on the new allegations of sexual abuse, finding "insufficient evidence to conclude that [the father] engaged in inappropriate touching or conduct with his child since the new visitation order was instituted." *Id.* at 664, 672.

In reversing the trial court's order in *Wilkins*, we held that the court had erred

---

**9.** Although § 16–914(a–1) states that the court may only award "visitation" upon making the required findings, we have held that the same findings also must be made before awarding custody to a party who has committed an intrafamily offense. *See P.F. v. N.C.*, 953 A.2d 1107, 1112 (D.C.2008) ("Because such a finding is mandated before an abuser can be granted visitation rights, the same requirement surely applies, *a fortiori*, where, as here, an adjudicated intrafamily offender is seeking custody.").

in failing to consider its earlier finding that the father had committed intrafamily offenses against the mother and the child. 928 A.2d at 670 ("[E]ven if a court finds that a parent has not committed a *new* intrafamily offense, D.C.Code § 16-914(a–1) ... require[s] the court to consider whether the perpetrator of a *prior* intrafamily offense ... has sustained his 'burden of proving that [his] visitation [with his child] will not endanger [the child] or significantly impair [the child's] emotional development.' ") (emphasis in original). Because the court had relied only on its determination that no new offense had been committed, it had failed to apply the statutory provisions that were triggered by its previous findings that the father had committed intrafamily offenses. In particular, we noted that the court "did not explicitly consider the factors relevant to the best interest of the child determination" under D.C.Code § 16-914(a)(3)(E), which specifically lists "evidence of an intrafamily offense" as a relevant factor. *Wilkins*, 928 A.2d at 672. Moreover, we emphasized that the court did not "adhere to the mandate in § 16-914(a–1) ... to consider the impact of such an offense on [the child's] emotional development...." *Id.* In addition, we held that the court's decision to allow unsupervised visitation was unsupported by the evidence because "no expert testified that unsupervised visits between [the father and the child] would be appropriate." *Id.* at 670–71.

This case is distinguishable from *Wilkins* in several important respects. First, the trial court in this case complied with applicable statutory requirements. The court specifically found that Mr. Jordan had committed two intrafamily offenses against Ms. Jordan, under D.C.Code § 16-1001(8) (2001); and the court expressly recognized that this finding gave rise to a rebuttable presumption against awarding custody to Mr. Jordan, under D.C.Code § 16-914(a)(2) (2001). The trial court then found that the presumption against joint custody due to the intrafamily offenses was rebutted; and it discussed the seventeen statutory factors relevant to determining the best interest of a child, under D.C.Code § 16-914(a)(3) (2001). Moreover, the court's August 21, 2009, custody order is "a written statement ... specifying factors and findings which support [the court's] determination" to award joint custody, under D.C.Code § 16-914(a–1) (2001). Thus, the trial court weighed the evidence of domestic violence and applied relevant statutory provisions in making its custody determination. This stands in stark contrast to *Wilkins*, where the court apparently did not consider the impact of the intrafamily offenses at all, and "did not explicitly consider the factors relevant to the best interest of the child determination." 928 A.2d at 672.

To be sure, the trial court in this case neglected to make express findings under § 16-914(a–1) that Mr. Jordan did not pose a danger to Ms. Jordan and the children, and that joint custody would not significantly impair the children's emotional development. The record demonstrates, however, that the court made the required findings implicitly when it determined that Mr. Jordan was a fit parent and that joint custody was in the best interests of the children. The 16–page custody order gives full consideration to the evidence of intrafamily offenses; indeed, that evidence is one of the first things discussed in the order. But the order also recounts the deterioration of the children's previously "normal" relationship with their father, and considers the serious toll that parental alienation would take on the girls' mental health. The court undeniably was focused on the children's emotional development, expressing concern about the "emotional consequences" of the current situation, including the potential effects on the children's "emotional growth and maturity[,]

... their ability to develop healthy attachments and relationships in the future[, ... and] their self esteem and how they relate to the world around them." And the court stated orally, at the August 6, 2009, hearing, that it had given due consideration to the "emotional damage that [the girls] are suffering, combined with the efforts that Mr. Jordan has taken to rectify the conduct that led to that inappropriate behavior on his part," apparently giving Mr. Jordan credit for his voluntary participation in individual therapy and his attempts to make amends with E.J. Thus, the court's determination that joint custody was in the children's best interests obviously reflected its judgment that Mr. Jordan was not a danger, and that the emotional damage to the children due to parental alienation would be worse than the difficulties they would face in attempting to salvage their relationship with their father. The court essentially found that the children's emotional development would be significantly impaired if it did *not* award joint custody to Mr. Jordan.

■ All of the trial court's findings and conclusions were amply supported by the record. Dr. Zuckerman, a mental-health professional who had thoroughly studied the situation, recommended that the court award joint legal and physical custody to the parties; and the court followed that recommendation. Dr. Zuckerman opined that "it is strongly in [E.J.]'s best interests to redevelop a good relationship with her father." Moreover, Dr. Zuckerman averred that "there is nothing in Mr. Jordan's history or test material which would suggest that he is any more likely than most" to be dangerous; and that the past instances of violence were "situational" and did not predict future violence by Mr Jordan. Indeed, the instances where Mr. Jordan "got physical" with Ms. Jordan did not result in any significant injury to Ms. Jordan; and the physical contact was triggered by arguments about day-to-day do-

mestic issues—*e.g.,* what the family had for dinner, and who should clean the kitchen—which presumably would not recur after the parties were no longer living together. Furthermore, we discern no unbiased evidence in the record that contradicts Dr. Zuckerman's opinion about Mr. Jordan: Every expert or mental-health professional who was consulted by Dr. Zuckerman concluded that Mr. Jordan was not dangerous. The strong record support for the trial court's actions further distinguishes this case from *Wilkins,* where not a single expert or health professional supported the trial court's ruling.

■ Ms. Jordan suggests, however, that implicit findings that are supported by the record do not comply with the statute, and that *Wilkins* requires explicit findings. We disagree with that interpretation of *Wilkins.* In *P.F. v. N.C.,* 953 A.2d 1107, 1112 (D.C.2008), we reversed a trial court's award of joint custody to a father who had committed intrafamily offenses, because "reading the judge's order as whole, we [were] unable to state with confidence that full consideration and due weight were accorded to the District's policy disfavoring a custody award to an abuser in the absence of proof that such an award is consistent with the safety and well-being of the child or children, and the judge's order [did] not expressly address the point." Judge Schwelb, who authored the Court's opinion, noted in a concurring opinion that *P.F.* was "a fairly close case." *Id.* at 1120. The fact that the case was "close" despite the trial court's failure to "expressly address" how the intrafamily offenses affected the father's claim for sole custody suggests that there is no rule of automatic reversal when a trial court neglects to make explicit findings. Indeed, as compared to *P.F.,* this case is the opposite side of the coin: Here, reading the judge's order and the record as a whole, we *are*

able "to state with confidence that full consideration and due weight were accorded to the District's policy disfavoring a custody award to an abuser." *P.F.*, 953 A.2d at 1112. Where the record so plainly supports the conclusion that the required findings were actually (though implicitly) made, reversing and remanding the case for an explicit finding would be a waste of judicial resources and would elevate form over substance.

■ Ms. Jordan's other challenges to the custody order merit less discussion. Her arguments that the trial court was required to make express findings about other instances of alleged domestic violence, and that those other incidents "clearly" were intrafamily offenses, are unpersuasive. We note that additional findings that Mr. Jordan had committed even more intrafamily offenses would not have affected the legal analysis here, because the relevant statutory provisions already were triggered by the court's finding that two such offenses were committed. Moreover, the trial court was aware of the additional incidents cited by Ms. Jordan, noting that Ms. Jordan had "described multiple incidents where [Mr. Jordan] lost his temper," but that "[t]hese incidents do not fall within the definition of domestic

violence in the District of Columbia." The trial court's factual finding that the additional incidents did not constitute intrafamily offenses was not clearly erroneous. It is by no means clear that Mr. Jordan committed additional crimes against family members.[10] We note that all of Ms. Jordan's allegations concerning additional incidents of violence are characterized in the light most favorable to her position, without regard to evidence in the record that tends to cast doubt on her credibility. Dr. Zuckerman testified that Ms. Jordan's "perspective is somewhat distorted here. That [she has] the facts right but that the intensity of the difficulties and the danger that this poses to [A.J. and E.J.] are pretty outlandishly exaggerated or hyperbolized [or] somehow wrong." The trial judge stated at the August 6, 2009, hearing, "I do find that there have been incidents of domestic violence between Mr. Jordan and Ms. Jordan. I don't think they're to the extent that [Ms. Jordan] claim[s] they have occurred." We cannot say that the trial court clearly erred in making that finding. Furthermore, the trial court was not required to rule with specificity on every allegation made during the nine-day custody trial—particularly where Ms. Jordan never asked the trial court for specific

---

**10.** For example, Ms. Jordan argues that when Mr. Jordan drove a car dangerously while angry, and when he broke a knife in a cutting board, he "clearly" assaulted her because those acts were committed with an intent to frighten her. Ms. Jordan cites no precedents where we have upheld assault convictions on similar facts, instead citing cases where the conduct at issue was more directly assaultive. *See Joiner–Die v. United States*, 899 A.2d 762, 765 (D.C.2006) (defendant "exited his vehicle, with an angry look on his face, reached into his front jacket pocket and stated [to the victim] 'I'm going to bust your ass' "); *Robinson v. United States*, 506 A.2d 572, 575 (D.C.1986) (defendant pointed a gun at a police officer); *Williamson v. United States*, 445 A.2d 975, 979 (D.C.1982) (defendant "grabbed an umbrella with a metal bar attached to it, pointed

it at [the victim], and told her, 'You see this, I'm going to use this, you're going to do as I tell you to do.' "). In addition, Ms. Jordan demands too much when she asserts that the court was required to make a more detailed finding regarding the incident where Mr. Jordan allegedly shook E.J. In our view, the court essentially found that no crime had occurred when it stated in the custody order that Child Protective Services conducted an investigation, determined that E.J. seemed coached, and concluded that the allegations of child abuse were "unfounded." In any event, Ms. Jordan's arguments about this incident and certain others involving E.J. ignore our cases that discuss the defense of parental discipline. *See Longus v. United States*, 935 A.2d 1108, 1111 (D.C.2007); *Lee v. United States*, 831 A.2d 378, 380–81 (D.C.2003).

findings, despite having opportunities to do so when making closing argument to the court, and when requesting reconsideration of the custody order. We therefore decline to disturb the trial court's factual determination.

Finally, Ms. Jordan contends that the trial court erred in relying solely on the threat of parental alienation to rebut the presumption against joint custody after a finding of an intrafamily offense. Ms. Jordan argues at length that (1) evidence of alienation cannot rebut the presumption against joint custody because alienation "has no bearing on the safety of [the] parent or the children"; and (2) that, because Mr. Jordan's conduct was the cause of the alienation, the trial court erred when it "used ... Mr. Jordan's own troubling, and at times abusive, behavior as a reason to grant him *more* access to the children." We believe, however, that this argument reflects a misinterpretation of the trial court's order. In fact, the trial court did not rely only on the danger of parental alienation to rebut the presumption, but instead considered that danger as one factor of many. To be sure, the custody order states that the presumption was rebutted, and in the same paragraph, discusses parental alienation. Thereafter, however, the order goes on to review seventeen factors that might affect the best interests of the children. Moreover, the trial judge stated at the August 6, 2009, hearing that, "[i]n deciding whether [the presumption] has been rebutted, I look at [the] totality of the circumstances surrounding the situation. I consider the testimony of the witnesses, the contents of the exhibits, and the information set forth in the report that has been admitted." Thus, the record in this case establishes that the trial court carefully assessed numerous factors, both in determining whether the presumption against joint custody was rebutted and in evaluating the best interests of E.J. and A.J. We there-

fore reject Ms. Jordan's contention that the trial court relied solely on the evidence of parental alienation to rebut the presumption against awarding custody to Mr. Jordan.

## III. The Orders Appointing a Parenting Coordinator

Ms. Jordan's challenge to the appointment of the parenting coordinator raises for the first time in this Court the questions of whether a trial court may make such an appointment over a party's objection, and what the limits of a parenting coordinator's authority should be. We hold that Rule 53 of the Superior Court Rules Governing Domestic Relations Proceedings authorized the trial court both to appoint a parenting coordinator under the exceptional circumstances presented by this case, and to delegate decision-making authority to the parenting coordinator over day-to-day issues that do not implicate the court's exclusive responsibility to adjudicate the parties' rights to custody and visitation.

■ Ms. Jordan further argues that the trial court erred in (1) ordering her either to pay for half the costs of the parenting coordinator, or to have those costs offset against her child-support payments; (2) requiring her to cooperate with Mr. Jordan in the use of a parenting coordinator, despite the court's finding that Mr. Jordan committed intrafamily offenses; (3) forcing her to waive her medical privilege so that her medical records could be made available to the parenting coordinator; and (4) assessing "unreasonable court costs" against her, in the form of the parenting coordinator's fees. We hold that the trial court did not abuse its discretion in ordering Ms. Jordan to bear half the costs of the parenting coordinator; and that Ms. Jordan's remaining claims were not pre-

served for appeal and fail the rigorous test of plain error.[11]

## A. Jurisdiction

 As a threshold matter, Mr. Jordan asserts that this Court does not have jurisdiction to consider Ms. Jordan's challenge to the December 29, 2009, orders appointing a parenting coordinator because Ms. Jordan could have, but did not, raise that claim in her appeal of the trial court's August 21, 2009, custody order. Mr. Jordan cites no authority that precludes our consideration of the later order on this theory.[12] The December order was far more detailed and specific than the August order with respect to the appointment of the parenting coordinator, and we see no reason to deny Ms. Jordan the opportunity to seek review of the December order merely because an earlier order discussed the parenting coordinator in more general terms.

This Court has jurisdiction over appeals from both "final orders and judgments," D.C.Code § 11–721(a)(1) (2001), and "interlocutory orders ... granting, continuing, modifying, refusing, or dissolving or refusing to dissolve or modify injunctions," id. § 11–721(a)(2)(A). Although the December 29, 2009, orders appointing the parenting coordinator direct further action that might be subject to supervision by the trial court, the trial court had resolved the questions of divorce, custody, visitation, and support. The additional supervision contemplated here, given the resolution of all of the other issues, was analogous to the type of additional supervision inherent in all custody orders, which we have routinely reviewed on appeal. See, e.g., P.F. v. N.C., 953 A.2d at 1112–13; W.D. v. C.S.M., 906 A.2d 317, 320 (D.C.2006).[13] Thus, like in Wilkins v. Bell, which held that an order suspending one parent's child support obligations under a prior support order while the minor was staying with that parent was appealable, "[w]e are satisfied that the [December 29, 2009 orders fall] somewhere among the types of rulings that D.C.Code § 11–721 (2001) authorizes this court to review." See 917 A.2d 1074, 1078 (D.C.2007); see also McDiarmid v. McDiarmid, 594 A.2d 79, 81 (D.C.1991) (an order is final when the trial court has "nothing remaining to do but to execute the judgment or decree already rendered").

## B. Standard of Review

The trial court's reliance on Super. Ct. Dom. Rel. R. 53 to appoint a parenting

---

11. Ms. Jordan was represented by counsel during the divorce proceedings but proceeded pro se during the custody proceedings before the trial court. In evaluating Ms. Jordan's legal claims, we note that "[i]n cases where a party is a pro se litigant, the general principle [is] that such a litigant can expect no special treatment from the court." Padou v. District of Columbia, 998 A.2d 286, 292 (D.C.2010) (quoting MacLeod v. Georgetown Univ. Med. Ctr., 736 A.2d 977, 979 (D.C.1999) (internal quotations omitted)). However, we bear in mind that "trial judges" must "exercise special care with a pro se litigant in special circumstances." Padou, 998 A.2d at 292.

12. Mr. Jordan cites Fajardo Shopping Center v. Sun Alliance Ins. Co., 167 F.3d 1 (1st Cir. 1999), for the proposition that Ms. Jordan's

appeal of the parenting coordinator orders "is not timely and should be dismissed." Fajardo Shopping Center is easily distinguished from this case in several ways—the most important being that the party challenging the appointment of a special master in that case consented to the special master's appointment and never challenged the trial court's authority to make such an appointment at any point. 167 F.3d at 6.

13. This case is clearly distinguishable from those custody cases in which we were without jurisdiction because the trial court's order was not final. See In re J.W., 806 A.2d 1232, 1234 (D.C.2002) (finding no jurisdiction over appeal from denial of immediate custody while final determination of custody was pending).

coordinator, and the court's authority to delegate decision-making authority to the parenting coordinator, present legal issues that we review *de novo.* *See* D.C.Code § 17–305(a) (2001); *Wilkins,* 928 A.2d at 666. We review the trial court's apportionment of half the costs of the parenting coordinator to Ms. Jordan, and its ruling that the costs may be deducted from child-support payments, for abuse of discretion. *See Beraki v. Zerabruke,* 4 A.3d 441, 447 (D.C.2010) (citing, *inter alia, Slaughter v. Slaughter,* 867 A.2d 976, 977 (D.C.2005)).

 Ms. Jordan's remaining claims—*i.e.,* that it is contrary to public policy to utilize a parenting coordinator where there is a history of domestic violence, that Ms. Jordan was improperly forced to waive her medical privilege, and that the costs associated with the parenting coordinator are "unreasonable court costs"—were not preserved for appeal because Ms. Jordan did not object on those grounds in the court below. *See Thornton v. Norwest Bank of Minn.,* 860 A.2d 838, 842 (D.C.2004) (holding that "[i]t is fundamental that arguments not raised in the trial court are not usually considered on appeal") (internal quotations and citations omitted). We therefore review those claims only for plain error. Under that standard, Ms. Jordan has the burden to show that "(1) there was error, (2) the error was obvious or plain, and (3) the error 'affected substantial rights.' If those three conditions are met, the court has discretion to notice the error and reverse

if it resulted in a miscarriage of justice or seriously affected the fairness and integrity of the trial." *N.D. McN. v. R.J.H.,* 979 A.2d 1195, 1199 (D.C.2009) (citing *United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

## C. Analysis

We begin by providing context for the trial court's appointment of a parenting coordinator in this case. In the past decade, the use of parenting coordinators in high-conflict custody cases has become increasingly common. Parenting coordinators simplify the litigation process in highly contentious parenting situations by helping parents to reduce conflict, while decreasing their reliance on the intervention of the courts. *See* Dana E. Prescott, *When Co–Parenting Falters: Parenting Coordinators, Parents–in–Conflict, and the Delegation of Judicial Authority,* 20 Maine Bar J. 240, 240 (Fall 2005); *see also* Christine Coates, *et al., Parenting Coordination for High–Conflict Families,* 42 Fam. Ct. Rev. 246 (April 2004). Because interparental conflict is "the major source of detriment to children of divorce," and "most [parental disputes in the divorce context are] minor ... such as one-time changes in [matters like] telephone access [... and] after-school activities," the availability of a parenting coordinator to minimize day-to-day disagreements is in the best interests of the children. *See* Coates, *supra,* at 246–47. We are aware of 30 jurisdictions, in 27 states, that permit the appointment of parenting coordinators pursuant to a statute or court rule.[14] In

14. Nine of those jurisdictions have statutes authorizing the appointment of parenting coordinators. *See* Cal.Civ.Proc.Code § 638 (Deering 2010); Colo.Rev.Stat. § 14–10–128.1 (2010); La.Rev.Stat. Ann. §§ 9:358.1–358.9 (2010); Me.Rev.Stat. Ann. tit. 19–A, § 1659 (2010); Minn.Stat. § 518.1751 (2010); N.C. Gen.Stat. §§ 50–90 to –100 (West 2005); Okla. Stat. tit. 43, §§ 120.1 to 120.5 (West 2003); S.D. Codified Laws § 25–4–63 (2008); Tex. Fam.Code Ann. §§ 153.061 to 153.611

(Vernon 2009). Fifteen of the jurisdictions use a court rule. *See* Ill. Cook Co. Cir. Ct. R. 13.10 (2011); Ind. Lake Co. L.R. 45–FL–00–8 comm. E; Ind. Wayne Co. L.R. 89–FL00–11; Ky. Jefferson County Fam. R. Proc. 707; Mo. 31st Cir. Local R. 6.9(d)(6); Nev. 1st. Jud. Dist. R. 5(6) (2010); Ohio Butler County Ct. Com. Pl. Dom. Rel. R. 44; Ohio Lucas County Ct. Com. Pl. Dom. Rel. R. 20; Ohio Mahoning County Ct. Com. Pl. Dom. Rel. R. 34; Ohio Stark County Fam. R. 16; Pa. Allegheny

addition, we are aware of nine other jurisdictions where courts have referred to the use of parenting coordinators in opinions, but did not specifically cite the authority relied upon to appoint a parenting coordinator.[15]

The District of Columbia appears to be the only jurisdiction that has an Office of the Parenting Coordinator (OPC), which provides services to low-income parties who cannot afford to retain private parenting coordinators. As discussed in the helpful brief filed by *amicus curiae*, the Bar Association of the District of Columbia, courts in the Domestic Relations Branch of the Superior Court routinely refer cases to the OPC, which was established as a pilot project in December 2004. Parenting coordinators in the OPC program have authority to "assist the parents in developing a parenting plan" and to "mediate disagreements between the parents." Significantly, when parents participating in the OPC program cannot resolve disagreements over "day-to-day issues," the parenting coordinator "is authorized to decide the dispute with a 'binding recommendation' that 'is as effective as a court order and must be obeyed,' unless it is later modified or set aside by the parent coordinator or the court."[16] To be eligible to participate in the OPC program, the parties must consent to the use of the parenting coordinator, and they may not have ongoing issues of domestic violence or a history of sexual abuse.

Ms. Jordan agrees that this appeal does not implicate the work of the OPC, which provides services only where both parties agree to permit the parenting coordinator to resolve their disputes. She argues that this case is distinguishable from those that involve the OPC because here, the trial court appointed the parenting coordinator over Ms. Jordan's objection; did so after finding that Mr. Jordan had committed

---

County Civ. & Fam. R. 1915.17 (2010); Pa. Erie County Civ. Local R. 1940.10 to .16 (2010); Utah R. Jud. Admin. 4–509 (2010); Vt. R. Fam. Proc. 4(s) (2010); Wash. Thurston County Super. Ct. Local Spec. R. 94.13 (2010). And five jurisdictions have both a statute and a court rule. *See* Ariz.Rev.Stat. § 25–405 (LexisNexis 2010) and Ariz. Fam. Law R. Proc. 74 (as revised 2011); Fla. Stat. Ann. § 61.125 (LexisNexis 2010) and Fla. Fam. Law R. Proc. 12.742 (2010); Idaho Code Ann. § 32–717D (2010) and Idaho. R. Civ. P. 16(*l*); N.D. Cent.Code §§ 14–09.2–01 to –08 (2010) and N.D. R. Ct. 8.11; Or.Rev. Stat. § 107.425 (2009) and Or. Multnomah County Supp. Local R. 8.137 (Effective Feb. 1, 2011).

**15.** *See Meyr v. Meyr,* 195 Md.App. 524, 7 A.3d 125, 139–40 (2010); *Tammaro v. O'Brien,* 76 Mass.App.Ct. 254, 921 N.E.2d 127 (2010); *Burris–Awalt v. Knowles,* 148 N.M. 616, 241 P.3d 617 (App.2010); *Cochran v. Cochran,* 5 So.3d 1220 (Ala.2008); *McGarrah v. Posig,* 280 Ga.App. 808, 635 S.E.2d 219 (2006). *See also Fay v. Grant,* 2010 WL 5065237, 2010 Conn.Super. LEXIS 2988 (Conn.Super.Ct.2010); *R.C. v. D.S.,* 2010 WL 2708621,

2010 Del.Fam. Ct. LEXIS 29 (Del.Fam.Ct. 2010); *Nesbitt v. Nesbitt,* 2009 WL 112538, 2009 Tenn.App. LEXIS 44 (Tenn.Ct.App. 2009); *Bilski v. Bilski,* 2010 WL 3303820, 2010 Va.App. LEXIS 347 (Va.Ct.App.2010). One other state, New Jersey, has a formal pilot program for parent coordination. *See* N.J. Office of Admin. of Cts., *Parenting Coordinator Program Implementation Guidelines,* available at http://www.judiciary.state.nj.us/notices/2007/n070403a.pdf (April 2007).

**16.** The day-to-day issues that may be resolved by a parenting coordinator appointed through the OPC include "logistical decisions or those implementing the custody arrangement agreed to by the parents or ordered by the court, [e.g.,] decisions about pick up and drop off[; ...] logistical decisions relating to the regular schedule, vacations or holidays; the manner and schedules of communication between the parents and the children; and matters of daily consistent routines to be applied in both households...." The parenting coordinator may not make decisions infringing "the court's exclusive jurisdiction to determine fundamental issues of custody and visitation."

intrafamily offenses against Ms. Jordan; and required Ms. Jordan to pay half the costs of the parenting coordinator or have the costs offset against child-support payments. Ms. Jordan takes issue with the trial court's authority to appoint a parenting coordinator with the power to decide day-to-day issues, without Ms. Jordan's consent; and to require Ms. Jordan to contribute payment for services that she does not want.

## 1. Application of Rule 53

The trial court relied upon Super. Ct. Dom. Rel. R. 53 in appointing the parenting coordinator in this case. Rule 53 governs the use of "special masters," and provides, in relevant part:

> (b) *Reference.* Upon motion or of its own initiative, the Court may refer a matter to a Master. Except in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.
>
> &ast; &ast; &ast;
>
> (c) Powers. The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearing and for the filing of the master's report. Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before the master and to do all acts and take all measures necessary and proper for the efficient performance of the master's duties under the order.

Ms. Jordan's assertion that the trial court had no authority to appoint the parenting coordinator or special master over her objection is refuted by the plain language of Rule 53. The rule contemplates appointment of a special master "[u]pon motion or of [the court's] *own initiative* ... upon a showing that some exceptional condition requires it." (Emphasis added.) Although the trial court did not expressly find that an "exceptional condition" required the use of a special master here, we are satisfied that the necessary showing was made. The trial court determined, after consideration of all of the evidence presented to it, that joint custody by the parties was in the best interests of the children. The court also found, however, that the parties's relationship was "fraught with conflict" and that the parties "are not able to reach joint decisions regarding the children." It is clear on this record that the joint-custody arrangement could not be successful without some procedure to mediate and resolve day-to-day disputes between the parties. Thus, the "high-conflict" nature of the parties' relationship, coupled with the determination that joint custody was in the best interests of the children, created an "exceptional condition" that necessitated the appointment of a special master or parenting coordinator.[17]

---

17. We note that a strong argument could also be made that the utilization of a parenting coordinator was a condition of the award of joint custody. The August 21, 2009, custody order stated that joint custody was granted to the parties "subject to" numerous conditions, including the appointment of a parenting coordinator "to assist them in making parenting decisions for their children." The trial court has discretion to impose conditions in awarding custody or visitation. *See* D.C.Code § 16–914(d)(3) (2001) ("In making its custody determination, the Court may order either or both parents to attend parenting classes"); *Hutchins v. Compton*, 917 A.2d 680, 683 (D.C.2007) (permitting trial court to assign final decision making authority to one party despite ordering joint custody); *Maybin v. Stewart*, 885 A.2d 284, 287–88 (D.C.2005) (upholding trial court's requirement that parties attend counseling before further visitation could take place); *Galbis v. Nadal*, 734 A.2d

Rule 53 also authorized the trial court to delegate decision-making authority over day-to-day issues to the parenting coordinator. Subsection (c) of the rule provides that the order referring a matter to a special master "may specify or limit the master's powers and may direct the master to ... do or perform particular acts.... Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to ... do all acts and take all measures necessary and proper for the efficient performance of the master's duties under the order." This language plainly gives the trial court discretion to determine what the duties and powers of the special master or parenting coordinator should be.

Of course, the court's ability to delegate authority to a special master or parenting coordinator has limits. Most clearly, in this context, a trial court may not abdicate its responsibility to decide the core issues of custody and visitation. By statute, when custody of a child is disputed, the trial court must decide what type of custody arrangement is appropriate. *See* D.C.Code § 16–914(a)(1)(A) (2001) ("The Court shall make a determination as to the legal custody and the physical custody of a child.") In addition, we have held that it is improper for a trial court to delegate decisions regarding a party's right to visita-

tion. *Lewis v. Lewis,* 637 A.2d 70, 72–73 (D.C.1994) (reversing trial court's order granting authority to mother to decide whether and when children would visit with father).

 In keeping with these limitations, the Special Master Order specified that the parenting coordinator may "make decisions resolving day-to-day conflicts between the parties that *do not affect the court's exclusive jurisdiction to determine fundamental issues of custody and visitation.*" (Emphasis added.) The Special Master Order further stated, "In the event of a dispute between the parties as to issues significantly affecting their children, the Special Master may make decisions regarding the following *day-to-day issues.*" (Emphasis added.) Thus, the order properly acknowledged and preserved the trial court's responsibility to decide the issues of custody and visitation. Ms. Jordan expresses alarm about another part of the order, which states, "[w]hen the parties are unable to make a joint decision, the Special Master shall make the final determination *on any issue.* The Special Master shall have the authority and discretion to delegate tie breaking authority *on any issue* to either parent." (Emphasis added.) The words in that passage were poorly chosen and certainly could be interpreted to vest much broader power in the

1094, 1102 (D.C.1999) (upholding requirement that adult with child-care experience be present during overnight visits with one parent); *see also Ysla v. Lopez,* 684 A.2d 775, 782 (D.C.1996) (noting that "[t]he possibilities [for a joint custody arrangement] are many and varied; the decision must, however, be committed to the reasoned exercise of discretion by the trial court, so that the decision may be tailored to fit the needs of each case."). Based on the wording of the August 21, 2009, order, it could be argued with some force that Ms. Jordan's apparent refusal to work with a parenting coordinator should have resulted in proceedings to modify the custody order, with the possible outcome that

sole custody would be granted to Mr. Jordan. Nevertheless, Mr. Jordan never argued that Ms. Jordan should lose custody of the children due to her recalcitrance in selecting and using a parenting coordinator, and the court never considered this possible consequence. Accordingly, we do not decide whether the appointment of a parenting coordinator was, or permissibly could be, a condition of joint custody in this case. We note, however, that if the court had explicitly made the utilization of a parenting coordinator a condition of joint custody, Ms. Jordan would have had a strong incentive to promptly select and cooperate with the parenting coordinator.

parenting coordinator, if taken out of context. The Special Master Order, however, must be read as a whole; the limiting language regarding the court's exclusive jurisdiction over custody and visitation modifies the more absolute language cited by Ms. Jordan. We read the order to permit the parenting coordinator to make decisions, or to delegate tie-breaking authority to either parent, only regarding "day-to-day" issues. Moreover, the order provides that any such decisions must be reduced to writing and are subject to review by the trial court.[18]

■ Ms. Jordan asserts that the Special Master Order does not comport with Rule 53 because the order does not require the parenting coordinator to prepare a report for the trial court regarding each day-to-day conflict that needs to be resolved, which the court may then adopt, modify or reject. Subsection (e)(1) of Rule 53 provides that "[t]he master shall prepare a report upon the matters submitted to the master by the order of reference and, if required to make findings of fact and conclusions of law, the master shall set them forth in the report"; and subsection (e)(2) provides that "[t]he Court, after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further. evidence or may recommit it with instructions." *See* Super. Ct. Dom. Rel. R. 53(e)(1), 53(e)(2). The Special Master Order, in turn, provides, "[u]pon motion of either party, or upon the court's own initiative, the court may order the Special Master to provide a report on all relevant matters arising from her appointment." This provision in the order is not a precise application of Rule 53(e), but it is appropriately tailored to suit the circumstances. Here, a report may not be necessary at all because the trial court did not ask the special master to resolve a particular issue; yet, this provision nevertheless preserves the parties' and the court's ability to obtain a report if one is desired. The provision in the Special Master Order essentially permits the parties to waive the reporting requirement described in Rule 53(e).

■ As for the parenting coordinator's authority to make decisions about day-to-day issues, such decisions are not, in themselves, subject to the reporting requirements of subsections (e)(1) and (e)(2). Rather, the day-to-day decisions made by the parenting coordinator are analogous to the subsidiary decisions that special masters routinely make in other contexts— such as when special masters make evidentiary rulings, or make decisions about what methodology should be used to calculate damages. *See, e.g., Fed. Mktg. Co. v. Va. Impression Prods.*, 823 A.2d 513, 533–35 & n. 13 (D.C.2003) (co-special masters appointed to calculate damages arising from violation of consent decree excluded from consideration records that were "unavailable, voluminous or difficult to .obtain"; made finding that certain acts did not violate the consent decree; chose to employ a "sampling methodology" instead of examining every transaction that occurred over the course of five years; and ruled on how "profits" should be measured). These types of subsidiary decisions must be made in order for the special master to fulfill her duties. Such decisions are necessarily effective immediately, but may be reviewed by the trial court.

---

18. We note that the court's August 21, 2009, custody order provides that "[v]isits between E.J. and the defendant will increase at the discretion of the Parenting Coordinator in consultation with the therapist providing family reunification therapy for E.J. and the defendant." This provision of the joint-custody order is not before us on appeal, but is potentially problematic, in light of the broad authority granted to the parenting coordinator over visitation between E.J. and Mr. Jordan.

 We note that the trial court's reliance on Rule 53, in the absence of a specific rule or statute that permits the appointment of a parenting coordinator, is consistent with the approach taken by courts in other jurisdictions. As of 2003, only three states had parenting-coordinator statutes, while approximately ten other states " 'borrowed' the authority of a related statutory concept ... *e.g.*, using existing statutory authority for guardians *ad litem*, mediators, referees, or special masters." *See* Association of Family and Conciliation Courts' (AFCC) Task Force on Parenting Coordination, *Parenting Coordination: Implementation Issues*, 41 Fam. Ct. Rev. 533, at *5–6 (Oct. 2003). Although most of the jurisdictions that previously "borrowed" authority to appoint parenting coordinators now have statutes or rules that make such authority explicit, it is notable that the courts in those jurisdictions did not previously forego the use of this valuable resource merely because specific statutes or rules were not yet in place. Nor is it unprecedented for a court to endorse the delegation of limited decision-making authority to a parenting coordinator, despite the absence of a statute or rule that explicitly permits such a delegation of authority. *See Yates v. Yates*, 963 A.2d 535, 540–41 (Pa.Super.Ct.2008) (upholding the appointment of a parenting coordinator to "resolve only ancillary custody disputes, such as determining temporary variances in the custody schedule, exchanging information and communication, and coordinating [the child's] recreational and extracurricular activities"; court cited but did not rely on provisions of the Pennsylvania Rules of Civil Procedure governing masters and hearing officers); *see also Meyr v. Meyr*, 195 Md.App. 524, 7 A.3d 125, 139–40 (2010) (upholding trial court's decision to delegate authority to oversee family therapy, despite absence of "any Maryland law directly on point"; court noted that trial court had been care-

ful to avoid delegating custody or visitation issues); *Beatley v. Block*, No. 99–CAF–03016, 2000 WL 699653, at *3, 2000 Ohio App. LEXIS 2156, at *9 (Ohio Ct. App. May 16, 2000) (approving use of a parenting coordinator "to resolve visitation conflicts after entry of the final decree," without reference to any express authority).

In sum, the trial court's reliance on Rule 53 to appoint the parenting coordinator in this case was supported by the law and by precedents in other jurisdictions. We note that the Special Master Order itself was far from ideal, and that individual sentences in the order, read in isolation, would exceed the power of the Superior Court. Read as a whole, however, the order was a permissible exercise of the court's authority under Rule 53.

## 2. Due Process

 We note that the parenting coordinator's power to decide day-to-day disputes is a standard feature in the cases overseen by the OPC; and indeed, the efficacy of the parenting coordinator would be greatly diminished without this authority. Ms. Jordan contends, however, that allowing the parenting coordinator to make day-to-day decisions about the children violates her right to procedural due process. She asserts that this decision-making authority abrogates her right to determine the best interests of her children, and that the process contemplated by the Special Master Order allows the parenting coordinator to enter a "final order" on a disputed issue without giving her adequate notice and opportunity to be heard. We disagree.

 A due process challenge to the sufficiency of procedures requires a two-part inquiry: first, "whether the asserted individual interest [is] ... encompassed within the [Fifth Amendment's] ... pro-

tection of 'life, liberty, and property'"; and secondly, if such an interest is implicated, "what procedures are required to satisfy due process." *Richard Milburn Pub. Charter Alternative High Sch. v. Cafritz,* 798 A.2d 531, 541 (D.C.2002) (citing *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). The procedural due process requirement is "flexible and calls for such procedural protections as the particular situation demands," varying according to the nature of the interest that is at issue. *Richard Milburn Pub. Charter Alternative High Sch.,* 798 A.2d at 542 ("When protected interests are implicated, the Constitution requires notice and opportunity for hearing appropriate to the nature of the case.") (internal quotations omitted); *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). We balance "(1) the private interests affected by the proceeding; (2) the risk of error created by the jurisdiction's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *In re A.G.,* 900 A.2d 677, 681 (D.C.2006) (citing *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

The use of a parenting coordinator under the circumstances presented does not unduly impinge upon Ms. Jordan's "fundamental liberty interest ... in the care, custody, and management of [her] child[ren]." *In re J.T.B.,* 968 A.2d 106, 116 (D.C.2009) (citing *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Ms. Jordan's liberty interest must be reconciled both with Mr. Jordan's liberty interest regarding the children, and with the principle that "a biological parent's liberty interest is not

absolute, and must give way before the child's best interest." *In re J.T.B.,* 968 A.2d at 116 (internal quotations omitted); *see also In re A.H.,* 842 A.2d 674, 685 (D.C.2004) ("In the final analysis, the state has the right and duty to protect minor children through judicial determinations of their interest.").[19] Although the parenting coordinator may sometimes supersede Ms. Jordan's authority to make decisions regarding her children, the parenting coordinator may exercise that power only in limited circumstances, *i.e.,* where Ms. Jordan has a dispute with Mr. Jordan, who also has a liberty interest in making decisions for the children; and where the dispute concerns only a day-to-day issue.

In any event, even assuming that a fundamental liberty interest is implicated, that interest is adequately protected by the procedures available to a parent aggrieved by any decision made by the parenting coordinator. The Special Master Order requires that the parenting coordinator's decisions be reduced to writing, and preserves the trial court's authority to "modif[y] or set aside" the parenting coordinator's decisions at the request of either party, through "a timely motion requesting judicial intervention." Ms. Jordan erroneously contends that the parenting coordinator has the power to enter "final orders," and may do so without revealing the evidence relied upon to make the decision at issue. The review procedure outlined in the Special Master Order reserves "final" decision-making to the court, and the written record of the decision under review would presumably describe the basis of the parenting coordinator's decision. Although the process contemplates a limited period during which a decision by the par-

---

**19.** Our previous cases considering a parent's liberty interest in making decisions about his or her child dealt with termination of parental rights, either partially (through appointment of a guardian, *In re A.G.,* 900 A.2d at 680–81), or completely (by a grant of custody to another individual, *In re A.B.E.,* 564 A.2d 751, 754–55 (D.C.1989)).

enting coordinator will be in effect before the trial court has an opportunity to review it, this procedure for resolving day-to-day disputes serves a valid government interest. The day-to-day disagreements at issue often will require immediate resolution, and courts are not able to adjudicate such matters in the necessary time frame. The procedure established by the Special Master Order promotes the best interests of the children by providing a mechanism to resolve parental conflicts in a timely fashion. *See Barnes v. Barnes,* 107 P.3d 560, 565 (Okla.2005) (holding that appointment of parenting coordinator did not violate procedural due process, and that "[t]he extent to which a parent may be inconvenienced by cooperating with a parenting coordinator is subordinate to the need to protect the child's welfare"). Accordingly, the procedure outlined in the Special Master Order for resolving day-to-day disputes does not violate Ms. Jordan's right to procedural due process.

### 3. Apportionment of Costs

Ms. Jordan argues that the court's ruling that she must pay for half of the costs of the parenting coordinator or have her portion of the costs deducted from child-support payments "violates law and public policy," because it essentially eliminates the children's child support. We hold that the trial court did not abuse its discretion in making this ruling.

The August 21, 2009, custody order requires Mr. Jordan to pay $1,737.00 per month in child support for both children to Ms. Jordan. Ms. Jordan earns about $143,965 per year; while Mr. Jordan earns about $150,000 per year. The Special Master Order notes that the parenting coordinator shall be paid at a rate of $250 per hour, and that $6,000 must be paid up front, as a retainer. Ms. Jordan objected to the appointment of the parenting coordinator on the ground that Ms. Jordan "cannot afford these expensive services." She further argued that offsetting the cost against child-support payments would not be in the children's best interests.

The trial court's decision to require Ms. Jordan to pay half the costs of the parenting coordinator was fair and reasonable, and it certainly did not constitute an abuse of the court's discretion. Ms. Jordan's income is roughly equal to that of Mr. Jordan, and Mr. Jordan expended $21,500 to pay the full cost of the custody evaluation. Moreover, Dr. Zuckerman opined that the "most important" work of the parenting coordinator would center around Ms. Jordan and E.J. Thus, it was anticipated that a significant portion of the costs related to the parenting coordinator would be incurred by Ms. Jordan. Although Ms. Jordan protested that she could not afford the services of the parenting coordinator, she also argued to the trial court, in the context of seeking sole custody, that she could support the children financially; that she had been maintaining two homes for a while; and that her home is larger than Mr. Jordan's home. Her unwillingness to pay for the parenting coordinator's services thus appeared to be rooted in recalcitrance, not penury. The trial court apparently recognized that Ms. Jordan was in a relatively strong financial position, but that she did not want to spend money on the parenting coordinator.[20] Under these cir-

---

**20.** When the trial court attempted to suggest a more economical way to engage a parenting coordinator—through a program in which graduate students would provide the services, under the supervision of trained professionals—Ms. Jordan dismissed that option, indicating that she did not want to be a "guinea pig" for "starting students." The court then responded, "[I]t's either that or you pay up the money. This is your two daughters that we're talking about. This is not a house at Thurmont [referring to Ms. Jordan's second home]."

cumstances, it was reasonable for the trial court to give Ms. Jordan the option of paying for the parenting coordinator out of her income, or out of the child-support payments. Although Ms. Jordan argues that such an "attachment" of child-support payments is against public policy, the reality in this case is that Ms. Jordan had the resources to pay for the parenting coordinator without using the child-support money. The court's order actually was a means of making sure that Ms. Jordan took responsibility for her share of the expenses, and there was no real danger that money needed to support the children would be diverted to the parenting coordinator. Accordingly, the trial court did not err in ordering that the costs of the parenting coordinator would be deducted from child-support payments if Ms. Jordan refused to pay her share of those costs.

### 4. Remaining Claims

As noted *supra*, Ms. Jordan's remaining challenges to the Special Master Order are subject to plain-error review because they involve claims that were not raised in the court below. First, Ms. Jordan asserts that the court erred in appointing a parenting coordinator because it is against public policy to require her to engage in any process requiring "joint decision-making and cooperation" with Mr. Jordan, who is a "batterer" and "abusive parent." We discern no error on this basis, much less error that is "plain, clear, or obvious." *See Kaliku v. United States*, 994 A.2d 765, 775 (D.C.2010). As discussed in detail *supra*, the trial court appropriately took account of Mr. Jordan's commission of two intrafamily offenses when it awarded joint custody to the parties, and when it appointed a parenting coordinator to facilitate the joint-custody arrangement. Moreover, all of the unbiased experts who were consulted in this case, including Dr. Zuckerman and Dr. Zitner, opined that Mr. Jordan is not a danger to Ms. Jordan or to the children. Accordingly, although joint parenting may be inappropriate in some cases where there is a history of domestic violence, this is not "plainly" such a case.

■ Second, Ms. Jordan asserts that the trial court erred in including a provision in the Special Master Order that requires her to make her medical records available to the parenting coordinator, in effect forcing Ms. Jordan to waive her medical privilege. The Special Master Order required both parents to execute "authorizations and/or releases necessary to allow the Special Master to speak with any third party, including medical, mental health and other professionals, who has treated or been involved with the parties or the children." The disclosure of this treatment information was "solely for the purpose of allowing the Special Master to obtain relevant information to assist in her work with the family." Ms. Jordan acknowledges that the order also stated that such releases "shall not be deemed a waiver of any applicable privilege," and that "[n]othing herein ... shall be construed as a waiver of either parent of the privilege of non-disclosure by the therapist regarding confidential information." Ms. Jordan's complaint is that she is being forced to waive her privilege and privacy interests "as to the Parenting Coordinator[ ]."

Ms. Jordan fails to meet her burden under the plain-error standard. Even assuming that this provision of the order violates her right to privacy in her medical and mental-health information, she has failed to show how this violation "affect[s her] substantial rights" or "results in a miscarriage of justice." *See N.D. McN.*, 979 A.2d at 1199. As an initial matter, Ms. Jordan does not identify any records or information that she actually would be forced to disclose, and does not specify why such disclosure would be prejudicial to her. As the trial court noted in its custody order, Ms. Jordan rejected Dr.

Zuckerman's recommendation that she engage in psychotherapy. Thus, she apparently has no mental-health records or information to reveal. Moreover, the results of Ms. Jordan's psychological testing and her interactions with Dr. Zuckerman are contained in the custody evaluation, which already is available to the parenting coordinator. Accordingly, we discern no harm to Ms. Jordan based on this provision. In any event, even if relevant information existed, we fail to see how its limited disclosure to the parenting coordinator, for the sole purpose of facilitating her work in this case, would result in a "miscarriage of justice."

Third, Ms. Jordan contends that requiring her to pay half the costs of the parenting coordinator "violates the public policy in favor of reasonable court charges." Again, we discern no error that is "plain, clear, or obvious." The costs associated with the parenting coordinator cannot be fairly characterized as "court charges." Rather, the costs at issue represent the parenting coordinator's compensation at an hourly rate. The parenting coordinator is to provide services to the parties in exchange for that compensation. Ms. Jordan cites no case where any court has held that such charges are "court charges" that must be "reasonable." To the extent that Ms. Jordan cites *United States v. Kras,* 409 U.S. 434, 446–49, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), and *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), those cases establish only that court fees must be reasonable as determined on a case-by-case basis, and do not address whether the costs of a parenting coordinator may properly be considered "court fees." Thus, Ms. Jordan's claim fails under the plain-error standard.

For the foregoing reasons, the judgments of the Superior Court are hereby

*Affirmed.*