GLICKMAN, Associate Judge,
concurring in part and dissenting in part:
Although I join the majority opinion in other respects, I would reverse the trial court’s decisions to divest Mr. Downing of his tie-breaking authority with respect to custody disagreements and to give such authority to a Family Treatment Coordinator. A trial court may modify a voluntarily negotiated child custody agreement “only if it finds (1) that there has been a change in circumstances which was not foreseen at the time the agreement was entered, and (2) that the change is both substantial and material to the welfare and best interest of the children.”[1] In my view the evidence of record does not support a finding that these conditions were met in this case.
In upholding the trial court’s ruling, my colleagues agree with its conclusion that *489 Downing abused his tie-breaking authority by his “consistent rejection of the FTC’s recommendations in favor of his original position each time the tie-breaking process was utilized.” Ante at 476. Supposedly, Downing “used his tie-breaking authority to essentially effectuate ‘de facto legal custody[1] ” over his daughters. Id. I think this is hyperbole. In point of fact, as my colleagues acknowledge, ante at 478-79, the record reflects only three instances in which Downing exercised his tie-breaking authority; and the trial court based its decision on only one of them, Downing’s “unreasonable” objection to his daughters’ participation in two extracurricular activities, Girl Scouts and Girls on the Run.[2] In my opinion, the record does not support a conclusion that Downing’s actions on these occasions amounted to an unforeseen change of circumstances following the parties’ 2012 custody agreement that was substantially and materially adverse to the welfare and best interest of the children.
First, there was no unforeseen change of circumstances. The relationship between Downing and Perry was contentious both before and after they entered into the 2012 agreement. There is nothing in the record to suggest that their relationship had changed for the worse.[3] Moreover, as my colleagues acknowledge, the involvement of the children in extracurricular activities was a principal “source of discord” even prior to the 2012 agreement.[4] While Perry might have hoped that the 2012 agreement would lead to improved communications and reduce the conflict in this area, the fact remains that she expressly contemplated and agreed that Downing would have the final say, and that he would be free to' reject her wishes and the Family Treatment Coordinator’s recommendations with regard to the children’s extracurricular activities. It therefore cannot be maintained that Downing’s exercise of the very authority Perry agreed to give him was an unforeseen change of circumstances.
Second, Downing’s exercise of his tie-breaking power was not substantially and materially contrary to the welfare and best interest of the children. This case is unlike Wilson v. Craig,[5] where this court upheld the modification of a custody agreement because of its unforeseen and seriously harmful consequences for the parties’ children. In that case, as the trial judge found, the parents had expected their agreement would reduce the conflicts between them, but instead “[t]he hostility had increased to an extent they had not anticipated and that was materially affecting the welfare of the children.”[6] Expert testimony established that the children were having trouble at school and had “discernible, definable, diagnosable conditions which ... [made] it more difficult for them to cope” with the custody arrangements, and the court found that the chil *490 dren were experiencing psychological and emotional distress.”[7]
There is no evidence of comparable harm to the children in this case. Everyone who testified at trial said the children were happy, physically healthy, doing well in school, doing well socially, and (miraculously) unaware of the pending litigation. There was testimony that the girls participated in a below average number of extracurricular activities for children their age because Downing refused to allow them to participate in Girl Scouts and Girls on the Run. My colleagues call .this refusal.“unreasonable” and assert that his reason for disallowing the activities did “not promote the best interests of the children.” Ante at 483. However, even if Downing’s refusals were motivated. by his. consternation with Perry, the fact remains that there was no evidence to suggest that his decisions were harming the children in any way, let alone substantially and materially.[8]
In sum, while it'may have been unwise for the parties to agree to give Downing tie-breaking authority, I do not believe the trial court had the authority to change their agreement without a supportable finding of an unforeseen, substantial, and material change in circumstances. “A motion for modification ... is not to be used as a pretense' to relitigate the equities of the prior decree.”[9] Even if the trial court’s modification is better for the children, that is not legally sufficient. We have held that the trial court cannot skip over finding an unforeseen, material change in circumstances, and move directly to fashioning a new custody arrangement based on a “best interest of the child” analysis.[10]
For the foregoing reasons, I respectfully dissent.-

. Foster-Gross v. Puente, 656 A.2d 733, 737 (D.C.1995); D.C.Code § 16-914(f)(l) (2012 Repl.) ("An award of custody may be modified or terminated upon the motion of one or both parents, or on the Court's own motion, upon a determination that there has been a substantial and material change in circumstances and that the modification or termination is in the best interest of the child.”).

. The issues on the other two occasions were whether his eleven-year-old daughter should receive the HPV vaccine, and whether the children should attend summer camp.

. In fact, the evidence suggests that the acrimony between the parties had declined somewhat. Dr. Missar, the Family Treatment Coordinator, testified that both parties were attempting to comply with his recommendations, and that the improvement in their relationship was "a work in progress.” Despite a consistent pattern of contentious behavior, Dr. Missar perceived that the incidents of conflict between the parties were less dramatic following the 2012 agreement.

. Ante at 482 ("In particular, the record reflects that Downing’s biggest concern and source of discord was Perry’s supposed circumvention of his consent in signing the children up for extracurricular activities.”).

. 987 A.2d 1160 (D.C.2010).

. Id. at 1164.

. Id. at 1162.

. Dr. Missar testified, in fact, that Downing’s "decision-making abilities are very solid,” and that in general he demonstrated "a very rational, logical assessment of [his daughters’] needs, how to intervene in them, how to provide for them, and make' decisions in their best interests.”

. Graham v. Graham, 597 A.2d 355, 357 n. 5 (D.C.1991).

. Foster-Gross, 656 A.2d at 737-38.