William A. WILSON III, Appellant,

v.

Francesca V. CRAIG, Appellee.

Nos. 05–FM–372, 06–FM–1450
and 06–FM–1553.

District of Columbia Court of Appeals.

Argued Jan. 15, 2009.
Decided Jan. 28, 2010.

David Schertler, with whom Lisa Freiman Fishberg, Washington, DC, was on brief for appellant.

Kristin Henrikson, with whom Linda A. Delaney and Margaret J. McKinney, Bethesda, MD, were on brief for appellee.

Before REID and BLACKBURNE–RIGSBY, Associate Judges, and PRYOR, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

In this dispute over child custody and corresponding child support obligations, William A. Wilson III appeals from a trial court judgment in favor of his former spouse, Francesca V. Craig. Mr. Wilson asserts that the trial court erred (1) in modifying the settlement agreement ("Agreement") by awarding sole legal and physical child custody to Ms. Craig; (2) by modifying, *sua sponte*, his child support obligation and overstating his ability to pay the increased obligation; (3) by awarding retroactive child support without a petition by Ms. Craig seeking a change in the child support amount; and (4) in holding Mr. Wilson in contempt of court for failing to timely pay retroactive child support. We affirm in part, and reverse and remand in part.

## I.

William A. Wilson III and Francesca Craig were married on September 14, 1985 in Newport, Rhode Island. During their marriage, they had four children, three of whom were still minors during the time of this litigation. Their divorce was finalized in April 2003. The day before the divorce

judgment was entered, they reached an Agreement. The Agreement, which was incorporated by reference but not merged into the divorce judgment, addresses property distribution, child custody, and child support.

The terms of the Agreement stated that the parties would have joint legal and physical custody and adhere to a timeshare schedule where the amount of time that the three youngest children resided with Mr. Wilson would over the course of 18 months, gradually increase to an equal, alternating-week schedule. It further required him to pay $6,000 per month in child support, plus school tuition, medical insurance and dental costs, and to maintain a life insurance policy for $1 million dollars. Ms. Craig was required to pay the children's un-reimbursed mental health care costs and the first $1,500 of un-reimbursed medical expenses.

### Modification of the Custody Agreement

On February 20, 2004, Ms. Craig filed a Motion to Modify the Custody Agreement and Related Relief. In the petition, Ms. Craig alleged that (1) the Agreement "fail[ed] to provide the parenting coordinator with any explicit authority to investigate problems arising between the parties and provide meaningful recommendations to the parties so they may work toward effective co-parenting," and (2) "[t]he alternating weekly schedule [was] developmentally inappropriate for most children and especially these children given the [ ] intractable conflict between the parties." Ms. Craig specifically requested that the court appoint a Special Master *pendente lite* and hold an evidentiary hearing to help determine what residential schedule and legal custodial arrangement would best serve the children. Following an evidentiary hearing in May 2004, the trial judge found "that the behavior of the three younger children indicated that they were experiencing psychological and emotional distress, which plainly was not in their best interests, and which appeared to be increasing rather than abating," and that Ms. Craig had made a credible preliminary showing of a "substantial and material change in the children's circumstance[s]." The judge also concluded that a forensic evaluator should make recommendations to the court regarding the feasibility of joint custody and the role of a parenting coordinator in the case, and appointed Dr. Bruce Copeland. Dr. Copeland had repeated meetings with the parents and children, as well as numerous other witnesses in a position to observe the family relationship, and drafted a 117 page forensic report. At the hearing scheduled for him to present his report to the trial court, Dr. Copeland testified that "continuing the [ ] joint custody agreement was not a workable recommendation based on the high conflict between the parents" and "excessive levels of discord" in the case. In his report, Dr. Copeland found that the children had "discernible, definable, diagnosable conditions which ... [made] it more difficult for them to cope with the added number of changes, transitions, and stresses inherent in living in two separate environments," noting that the children's teachers reported an increase in problems in school on Monday mornings, the day when two of the children transitioned from one household to another. He concluded that "[f]orcing a shared arrangement under these conditions" was "associated with risk and poor childhood outcome," and that concerning the possible expanded role of the parenting coordinator, Mr. Wilson was "the primary impediment to a parent coordinator['s ability] to force a timely dialogue and resolve disputes if needed."

In her comprehensive written Findings of Fact, Conclusions of Law and Judgment of Custody, the trial judge found Dr. Copeland's report and testimony about the increased hostility persuasive, and granted sole legal and physical custody of the three

minor children to Ms. Craig, allowing Mr. Wilson visitation rights on alternating weekends. This resulted in Ms. Craig having custody of the oldest child for an additional 87 days a year (almost three months) and of the two younger children for an additional 48 days a year (about 1.5 months), with a resulting increase in expenses for the mother.

**Modification of the Child Support Agreement**

In light of the new custody arrangement, the judge ordered the parties to attempt to negotiate a new child support agreement by May 20, 2005. When the parties failed to reach an agreement by that date, the judge held an additional evidentiary hearing in July and August of 2005 on the issue of child support. In the written Memorandum Order of Findings of Fact, Conclusions of Law and Judgment of Child Support, the trial judge found as follows.

Ms. Craig was employed by the Cordell Hull Institute at an annual salary of $30,000.00. Combined, Ms. Craig's and the minor children's monthly expenses were approximately $12,655. At the time of the Agreement, Mr. Wilson had been a partner with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale") earning a salary of as much as $700,000 per year. At the time of the hearing, Mr. Wilson was self-employed with Wilson International Law LLC, where he claimed to earn a salary of $240,000, but the judge found that he "ha[d] the potential and ability to earn much more than he claim[ed]." Taking that fact into account, the judge determined that Mr. Wilson's adjusted income was $398,966. Applying the District of Columbia Child Support Guidelines, the judge found that he was required to make a monthly child support payment of $12,617.

The judge found this substantial increase over the Agreement amount necessary in part due to the change from joint custody to Ms. Craig having sole custody, which the judge found had "created a material change in circumstances that was unforseen at the time the agreement was entered." [1] Moreover, pursuant to the parties' Agreement, the judge made the increase in support retroactive "to the date of the written request for modification," which the judge construed here to mean the June 4, 2006 Order she had issued requiring the parties to attempt to negotiate a new support arrangement. When Mr. Wilson failed to pay the retroactive child support as required, the judge held him in civil contempt.[2] Mr. Wilson argued that he was unable to pay the retroactive

---

1. Modification of a child support provision may be made "[u]pon the occurrence of a substantial and material change in circumstances sufficient to warrant the modification ... *without regard to* whether the agreement or settlement is entered as a consent order or is incorporated or merged in a court order[.]" *Mazza v. Hollis,* 947 A.2d 1177, 1181, n. 5 (D.C.2008) (citation omitted) (emphasis included in original). The judge also found that the guideline amount of $12,617 was representative of and necessary to meet the children's reasonable needs. In particular, she found the children required $8,387 a month for living expenses, but the amount did not include Ms. Craig's personal living expenses. Moreover, the children had mental health

needs exacerbated by the marital hostility, such that an additional $4,230 per month was needed to "cover[] the cost of regular mental health treatments for all three children" and was "intended for the support of the children only."

2. Mr. Wilson filed a Notice of Appeal and a Motion for Stay Pending Appeal challenging the Child Support Order and the $155, 972 in retroactive support. Wilson failed to pay any retroactive support, despite the fact that Ms. Craig and the parent coordinator attempted to formulate a payment plan for the retroactive support, and agreed to reduce the retroactive support amount to $83,972.

support; however, the judge was not persuaded, noting that his IRA account had a net portfolio value of at least $613,556.68, "more than sufficient to pay the Court ordered retroactive child support in the amount of $83,972.32." Ultimately, Mr. Wilson paid the amount and the contempt was dissolved.

## II.

 "Trial court determinations of custody, child support, visitation rights, and counsel fees ... are subject to reversal only for clear abuse of discretion." *Plumley v. Plumley,* 465 A.2d 393, 394 (D.C.1983) (quoting *Moore v. Moore,* 391 A.2d 762, 770 (D.C.1978)). At the same time, the trial court must include "detailed, written findings of fact and separate conclusions of law upon all matters," *id.* and "[i]f a trial court [has failed] to document its findings and conclusions" in the required manner, "we must remand for that purpose." *Id.* (citations omitted).

### A. Child Custody

 Appellant asserts that the trial court erred in modifying custody because "there was no unforeseen material change in circumstances justifying [the] modification."[3] Specifically, he disputes the judge's findings that the conflict between the parents had increased since the Agreement, that the children were negatively impacted by the increased hostility, and that the parenting coordination process envisioned by the Agreement had failed. To the contrary, we find no clear error in the judge's findings on this point. *See* D.C.Code § 17–305(a) (2001) ("When the case was tried without a jury, the [Court of Appeals] may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it.") The trial judge found that the parties had entered into the Agreement expecting that its provisions and the divorce would reduce hostility between them but that "[t]he conflict between the parties ha[d] been continuous, cumulative and ha[d] escalated since the execution of the Agreement" to the extent that they were unable "to be in the same room with one another." Expert testimony at the hearing confirmed that, despite the parties' expectations, the Agreement had not reduced the acrimony between the parents or its causes, but instead, the hostility had increased to an extent they had not anticipated and that was materially affecting the welfare of the children. Accordingly, the judge turned to the "best interest of the child" factors set forth in D.C.Code § 16–914(a)(3) (2001 & 2009 Supp.),[4] and found, by clear and con-

3. We have held that: "When custody arrangements have been determined by the parties' voluntary separation agreement, which has been incorporated but not merged into the divorce decree, the court can modify the provisions only if it finds (1) that there has been a change in circumstances which was not foreseen at the time the agreement was entered, and (2) that the change is both substantial and material to the welfare and best interest of the children." *Foster–Gross v. Puente,* 656 A.2d 733, 737 (D.C.1995) (citations omitted); *see also* D.C.Code § 16–914(f)(1) (2009 Supp.) ("An award of custody may be modified ... upon a determination that there has been a substantial and material change in circum-

stances and that the modification ... is in the best interest of the child.").

4. D.C.Code § 16–914(a)(3) states that:

In determining the care and custody of infant children, the best interest of the child shall be the primary consideration. To determine the best interest of the child, the court shall consider all relevant factors, including, but not limited to: (A) the wishes of the child as to his or her custodian, where practicable; (B) the wishes of the child's parent or parents as to the child's custody; (C) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any

vincing evidence, that it was in "the best interest of the children that the [ ] joint custody arrangement be modified" in favor of "sole legal and physical custody of the minor children" by the mother but with continued rights of visitation by Mr. Wilson. The judge's exhaustive findings on the issue are well supported by the testimony of Dr. Copeland and others, and by her first-hand observation of the demeanor of the parties and witnesses. *See In re E.H.,* 718 A.2d 162, 169 (D.C.1998). Thus, we will not disturb the change in custody.

## B. Child Support

■ Mr. Wilson next contends that the trial judge abused her discretion by modifying the child support when the parties were unable to renegotiate a revised amount. He argues first that as Ms. Craig had not requested an increase in child support, the judge had no authority to raise the issue and increase the amount in the face of the parties' Agreement fixing the required payment. He reads D.C.Code §§ 16–916.01(b) (2009 Supp.), for example, as restricting the judge to the role of "advis[ing] the parties" of their right and obligation regarding child support unless "the party entitled to child support has ... requested support" or a change in the amount. But we have never read the statutory scheme as a limitation on the judge's ability to act in this area in the absence of a party's request. Indeed, as far back as *Willcher v. Willcher,* 294 A.2d 486 (D.C.1972), we rejected "a dis-

tinction between a court, *sua sponte*, intervening to modify an agreement [or support] for the child's welfare, and a parent ... initiating action herself to have the court modify the Agreement's provision with respect to child support." *Id.* at 488; *see also Portlock v. Portlock,* 518 A.2d 116, 118–19 (D.C.1986) (noting "established" law "that parties ... may not contract away [their child support] obligation by including inadequate support provisions in separation agreements," in an area where "the trial court, as *parens patriae,* has both the power and the responsibility to order additional child support" (citations omitted)). Having fairly determined that changed circumstances required an alteration of the custody arrangement with a corresponding increase in the support-related expenses the mother would thereby incur, the judge was well within her authority to revise the support amount in order to protect the children's welfare. *See Willcher, supra,* 294 A.2d at 488.

■ Nor was it error for the judge, exercising her broad discretion in this matter, *see Prisco v. Stroup,* 947 A.2d 455, 458 (D.C.2008), to order production of additional financial information by the parties when the initial presentation of evidence left her unsatisfied that she had a basis for deciding the amount, if any, of a necessary increase in support. *See, e.g., In re M.D.,* 758 A.2d 27, 34 (D.C.2000). And, contrary to Mr. Wilson's suggestion, the trial judge did not unfairly limit his ability to counter

---

other person who may emotionally or psychologically affect the child's best interest; (D) the child's adjustment to his or her home, school, and community; (E) the mental and physical health of all individuals involved; ... (G) the capacity of the parents to communicate and reach shared decisions affecting the child's welfare; (H) the willingness of the parents to share custody; (I) the prior involvement of each parent in the child's life; (J) the potential disruption of the child's social and school life;

(K) the geographic proximity of the parental homes as this relates to the practical considerations of the child's or children's residential schedule; (L) the demands of parental employment; (M) the age and number of children; (N) the sincerity of each parent's request; (O) the parent's ability to financially support a joint custody arrangement; ... and (Q) the benefit to the parents.
The trial court dismissed factors (F) and (P) as being not applicable to the present case.

the additional financial information Ms. Craig supplied for admission into evidence. Furthermore, we find no error in the judge's determination that the change from joint to sole custody warranted an increase in Mr. Wilson's support obligation and, with one exception, in her application of the child support guideline to establish the revised amount.

■ The one point on which we agree with Mr. Wilson is that, in computing the income he could fairly be expected to earn going forward in his law practice, the judge failed to take into account the expenses of operating his own firm and the amount by which these necessarily would reduce his net earnings. *See, e.g., Plumley, supra,* 465 A.2d at 394 (For child support purposes, consideration of parties' finances must include analysis of their "net disposable income based on all legitimate financial obligations." (citation omitted)). Here, the judge's decision on the amount was based on a conclusion that through his law practice, Mr. Wilson could bill 1,000 hours per year at a rate of $450 per hour totaling $450,000 annually from the practice. But, appellant presented evidence that he would incur reasonable business expenses, approximately $150,000 per year, in operating the firm. Because we cannot determine from the judge's written opinion what weight, if any, she gave to this evidence or the manner in which she accounted for the inevitable costs of running a law practice, we must remand for further consideration of this issue. *Id.* (remanding for similar consideration). In all other respects, we sustain the judge's determination as to the revised support amount required by the change in custody and Mr. Wilson's ability to pay it.[5]

## C. Retroactive Award

■ The trial judge ordered the child support award to be retroactive from April 4, 2005, the date on which the judge first ordered the parties to attempt renegotiation of child support. Appellant argues that the trial court abused its discretion in awarding retroactive support because Ms. Craig never requested a retroactive change, and because pursuant to the Agreement, she was required to submit a written notice to appellant "setting forth the reason[s] for the requested modification" in order for any change "in the level of support to be retroactive."

Appellant's argument rests chiefly on D.C.Code § 46–204(c) (2001), which provides:

No modification of an award of ... child support ... may be retroactive, except that a modification may be permitted for the period during which a petition of modification is pending. The modification may then be permitted from the date on which the opposing party was given notice of the petition for modification ...

Just as he argued with respect to the revision of the child support amount, Mr. Wilson argues that the trial judge's *sua sponte* order for the parties to renegotiate the amount or, failing that, to appear for an evidentiary hearing on the issue, could not qualify as the "petition" required by the retroactivity statute, thus depriving her of the power to make the award retroactive. We do not agree. Once the judge had ordered a change in the terms of custody, appellant was on notice of the realistic possibility that the parties' child support arrangement would be modified accordingly to ensure that the children's interests would be protected. Nor can he

---

**5.** Because the judge's determination of the revised child support amount did not depend on a finding that Mr. Wilson had voluntarily chosen to restrict his income, we need not consider appellant's claim that the views the judge expressed on this point were unsupported by evidence.

dispute that once the judge flagged the issue of a possible need to revise the support arrangement, Ms. Craig vigorously advocated for an upward revision reflecting the expenses associated with the custody change. To suggest that the proposed increase was solely of the judge's creation and not sought by the mother, or that it left Mr. Wilson unaware about the possibility of a retroactive change, would turn the requirement of a petition on its head and leave the welfare of the children at the mercy of a parent's (or his or her counsel's) failure to make a formal request for modification. As long as Mr. Wilson had notice and a fair opportunity to counter any showing of a need to revise the support amount, no sound reason exists why the trial judge, having found the need for a revision in light of changed circumstances, could not order the limited retroactivity (that the statute contemplates) to the date when the issue was raised on the court's own motion to protect the interests of the children.

### D. Civil Contempt

■ On Ms. Craig's motion, and after a two-day evidentiary hearing during which the judge heard from four witnesses, including Mr. Wilson, the judge held him in civil contempt for failing to pay the retroactive support obligation that the judge had ordered. Although Mr. Wilson argues on appeal that he did not have the cash, savings, investments, or liquid assets to make the payments, the judge—in her twenty-six page written ruling—found both that he had been able to make the scheduled payments as they arose and that he was able to purge himself of the contempt by paying the arrearage. Among other things, the judge found that:

1) At the time, Mr. Wilson had an IRA account with Merrill Lynch valued at $613,556.68 and there were no restrictions as to when he could withdraw funds from the account or as to the amounts he could withdraw;

2) After May 29, 2006, he withdrew profits from his law firm of at least $156,000 ($100,000 on July 14, 2006, $6,000 on August 23, 2006, and $50,000 in October 2006);

3) On May 22, 2006, he opened a $200,000 home equity line of credit secured by his home. As of September 21, 2006, he withdrew $198,634.75 from this line of credit and used it to pay for substantial renovations to his home, including the demolition and renovation of his kitchen and 3.5 bathrooms, the installation of a new HVAC system, and new hardwood floors;

4) On or about August 23, 2006, Mr. Wilson received a loan of $83,000 from his parents; and

5) He had $110,563 in federal and District of Columbia income tax overpayments deposited with the Internal Revenue Service and the District of Columbia Treasury.

These findings, well-supported by the evidence, persuaded the judge that Mr. Wilson was fully able to pay the arrearage—and purge himself of the contempt— regardless of his earnings from his law practice. We have no reason to disturb the judge's conclusion, which is based on clear and convincing evidence, *see Lopez v. Ysla,* 733 A.2d 330, 336 (D.C.1999), that appellant willfully failed to meet his retroactive obligation despite the ability to discharge it.[6]

6. Given the judge's findings altogether establishing Mr. Wilson's ability to pay, we are unsympathetic toward his claim that he was unfairly required to suffer a penalty and pay taxes for withdrawing from his retirement account to discharge his obligation. He cites no authority for why retirement assets should be exempt from the reach of an obligation that makes the best interests of the children paramount.

In sum, we affirm in part and reverse in part; and this case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

**In re J.F., Appellant.**