*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 13-FM-1419 & 14-FM-531

BRIAN T. DOWNING, APPELLANT,

v.

CHARLOTTE M. PERRY, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(DRB-1909-05)

(Hon. Jeanette J. Clark, Trial Judge)

(Argued April 22, 2015                    Decided August 27, 2015)

*Gregory R. Nugent*, with whom *Brian T. Downing*, *pro se*, was on the brief, for appellant.

*Rebecca Gray* for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges,* and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* BLACKBURNE-RIGSBY.

Opinion concurring in part and dissenting in part by *Associate Judge* GLICKMAN at page 34.

BLACKBURNE-RIGSBY, *Associate Judge*:  This case involves a high-conflict

and prolonged child custody battle between parents, appellant Brian Downing and

appellee Charlotte Perry, over their two minor daughters, M.D. and E.D. The primary issue we address in this appeal is whether the trial court abused its discretion by concluding that a "substantial and material change in circumstances," D.C. Code § 16-914 (f)(1) (2012 Repl.), warranted modification of the parties' 2012 custody arrangement. The trial court's child custody modification granted Perry's request to remove Downing's tie-breaking authority in instances where the parties have a dispute over day-to-day legal custody matters, and instead vest that authority in a neutral Family Treatment Coordinator ("FTC"). The undisputed evidence revealed that Downing had disallowed essentially all extracurricular activities for the girls, and has never accepted the FTC's recommendation when it differed from his own position. On appeal, Downing principally contends that the trial court erred in modifying the custody arrangement because Perry failed to demonstrate a substantial and material change in circumstances to justify the modification. He also argues that the trial court's order delegated core issues of legal custody to the FTC.[1]

We conclude that there was a substantial and material change in circumstances supporting the modification of the custody agreement in this high-

---

[1] Downing raises three additional claims which we address summarily *infra* Part III.

conflict case, and that the trial court's order did not delegate core issues of legal custody to the FTC. To summarize, there was an unforeseen change in circumstances since the parties entered into the 2012 custody agreement. In particular, the evidence revealed that Downing was given tie-breaking authority so that the parties would communicate more effectively, and so that he would feel more comfortable in authorizing more extracurricular activities for M.D. and E.D. Yet, Downing continued to exhibit a patterned negative response[2] to Perry's parenting, which manifested itself in his consistent rejection of the FTC's recommendations in favor of his original position each time the tie-breaking process was utilized. Consequently, the girls were enrolled in fewer extracurricular activities than before the 2012 agreement, and Downing prohibited them from participating in activities in which they had previously participated. Notably, the trial court determined from the evidence that Downing had used his tie-breaking authority to essentially effectuate "*de facto* legal custody" over the children. Given such evidence, the trial court did not abuse its discretion in concluding that Downing had utilized his tie-breaking authority in a manner that was "not workable and [] not in the best interest of the minor children, e.g.,

---

[2] Specifically, Dr. Charles David Missar, the FTC in this case, described Downing as exhibiting "patterns of behavior that . . . were certainly much more easily triggered and . . . of a negative set . . . when [Perry] approached" him with her own suggestions for the girls.

extracurricular activities mushrooming into multiple issues affecting the minor children's best interest, including their mental and physical well-being." Accordingly, we affirm the trial court's order modifying the parties' custody agreement.

# I.    Factual Background

This appeal is merely the latest chapter in a long-standing conflict between the parties over their children. The instant action arises from a June 1, 2012, custody agreement between the parties that was incorporated, but not merged, into a June 20, 2012, consent order by the court ("2012 agreement").

## A. *History of Conflict*

Downing and Perry divorced in 2006, and have two minor daughters, M.D. born May 1, 2001, and E.D. born September 19, 2003.  Upon their divorce, the parties entered into a settlement agreement which granted Perry primary physical custody and both parties joint legal custody of their two minor daughters.  Yet about one year later, on August 3, 2007, Downing filed a motion for sole legal custody of the children, contending that Perry made unilateral decisions pertaining

to legal custody matters and sought to sabotage Downing's relationship with his daughters.[3]  The parties ultimately settled the matter by reaching a new custody agreement via a consent custody order issued on March 19, 2009 ("2009 order"). Under the 2009 order, Downing and Perry maintained joint legal custody of the children and approximately fifty-fifty residential custody.  **[Id. A-2, 3]**  This agreement called for the parties to work with a FTC, who "shall assist the parents with joint decision-making and in resolving conflicts when such joint-decision-making is not feasible or the parties cannot agree to a joint decision."  **[Id. A-11]** The FTC was authorized "to resolve the dispute by issuing a written recommendation, which shall be binding upon the parties unless and until it is set aside or modified by the Court."[4]

Approximately one year later, on June 14, 2010, Downing filed another motion seeking full custody of the children, making essentially the same accusations as before, namely, that Perry made unilateral decisions and sabotaged his relationship with the girls.  Pending trial, however, the parties entered into the

---

[3]  While this initial settlement agreement and record of the 2007 dispute does not appear in the record, the portion of the trial court's order referencing key provisions of this agreement and the procedural history of the 2007 dispute does not appear to be disputed by the parties.

[4]  However, Downing testified (and the trial court credited his testimony) that the FTC provisions of the 2009 order were never implemented.

instant 2012 agreement. Under the terms of the 2012 agreement, "[t]he parties shall share joint legal custody of the children . . . [and] [i]n the event that the parties are not in agreement regarding a legal custody decision which impacts the health, education, religion or general welfare, including extracurricular activities, of the children, the parties will consult with a FTC." However, unlike the terms of the 2009 order, Downing — rather than the FTC — now had final tie-breaking authority to resolve any disagreement between the parties on legal custody issues. The agreement explicitly states that "[b]oth parties agree that the FTC will not be asked to make decisions or have any tie-breaking authority. The FTC will only make recommendations."[5]

According to Jamie Desjardins, the former Guardian *ad litem* who helped broker the 2012 agreement, she recommended giving Downing tie-breaking authority over disputed legal custody decisions to lower conflict. Specifically, she "hoped" that it would "relax" Downing and "make him feel more comfortable authorizing things [i.e., activities] for the children." It was Desjardins's "hope that if [Downing] had . . . tie-breaking authority that he would feel like it would be

---

[5] Although the 2012 agreement superseded the FTC provisions of the 2009 order, essentially "[a]ll other provisions of the Consent Custody Order entered on March 19, 2009," remained unchanged, and therefore were incorporated into the 2012 agreement.

okay for the children to do certain activities because he wouldn't have to worry that [Perry] would be signing them up for other activities . . . ."

Downing claimed that initially following the 2012 agreement he felt "a great sense of relief," and thought the parties would "never see the inside of a courtroom again." Perry verified that Desjardin had recommended giving Downing tie-breaking authority, and that it would be "very risky" for Perry to go to court. Perry hoped that, with the advice of a neutral third party, Downing "might be able to make decisions in the best interest of [the] children." She also thought it was the best deal "under the circumstances," and that a third party individual would now "truly see the dynamics that were going on and would hopefully help [them] address those and work through them and communicate more effectively."

However, despite the 2012 agreement giving Downing tie-breaking authority, Downing once again filed for sole legal and primary physical custody of M.D. and E.D. on August 19, 2013. A multi-day evidentiary hearing on whether to modify the 2012 custody arrangement between the parties followed.

### B. The Evidentiary Hearing and Downing's Use of the Tie-Breaking Power[6]

At the evidentiary hearing, the chosen FTC, Dr. Charles David Missar,[7] testified that he began working with the parties in late-2012 or early-2013. Dr. Missar opined that the conflict between the parties stemmed from "a long history of mutual mistrust." He testified that although "there are many areas of the girls' participation [i.e., upbringing] . . . that they actually do agree on" the process of making joint decisions "in a reasonable and logical and rational manner has become so contentious" that even areas of agreement between Downing and Perry are lost in the fighting. For example, in order to avoid an immediate negative reaction from Downing, Dr. Missar counseled Perry to "phrase her suggestions" to Downing "in different terms so as to avoid making it sound like 'this is what I want' or 'this is my suggestion.'" However, Perry did not have the same instant negative response to Downing's suggestions. In fact, Dr. Missar could not recall a single instance in which Downing made a suggestion and Perry exhibited the same instinctive negative reaction. Notably, Dr. Missar also testified that, in his experience as an FTC and in his professional capacity working with numerous

---

[6] For purposes of appeal, we center our recitation of the evidence presented at the hearing on the parties' interactions with the FTC, and Downing's use of his tie-breaking authority following the 2012 agreement.

[7] Dr. Missar testified as an expert witness in the fields of clinical psychology, parenting coordination, and family treatment.

families, he has not seen a "high conflict situation" where "it has been effective or productive" for one of the parents to have tie-breaking authority. The trial court credited Dr. Missar testimony that "[i]n terms of the practical effects, given the circumstances between the parties [i.e., Downing and Perry]," there was not much difference between Downing's current tie-breaking authority and an award of sole legal custody.

The record reflects three instances in which Downing's patterned negative response towards Perry thwarted the FTC dispute process, and resulted in Downing exercising "*de facto*" legal custody of the children. On all three occasions, Downing perfunctorily rejected the FTC's recommendation in favor of his own original position. First, he unilaterally prevented M.D. from receiving a HPV vaccine, even though Dr. Missar recommended that "unilateral decision-making [in this matter] [was] not appropriate." In Dr. Missar's opinion, "[t]his type of decision goes to the heart . . . of necessary joint-parent decision-making." Nevertheless, in a one-sentence "tie-breaking" decision, Downing declared that, "Right now, I do not consent to the HPV [v]accine, and it won't be done unless I do consent." Second, Downing also prevented the children from attending Camp Wright, even though the summer camp fell during Perry's week with the children. Dr. Missar diplomatically recommended that the parties should focus on gauging

the girls' interest in the camp, and that, having resolved whether the camp fell during Perry's or Downing's week, he believed that "unilateral decisions about activities on another's parent's week [was] not appropriate." Yet again, Downing in one sentence and without explanation stated, "[M.D.] and [E.D.] will not attend Camp Wright this summer."

The third example merits extended discussion — Downing's refusal to let the girls attend Girl Scouts and another extracurricular activity, Girls on the Run ("GOTR"). M.D. and E.D. had previously participated in both Girl Scouts and GOTR. Downing testified that he believed "Girl Scouts [was] a great activity," and that GOTR was likewise a "good activity" that was "girl-oriented." However, following the 2012 agreement, Downing used his tie-breaking authority to prohibit the girls from participating in either activity, even though Dr. Missar explicitly recommended that the girls continue to participate in Girl Scouts because they both seemed to enjoy it. Dr. Missar even implored Downing that "for the sake of the girls and their consistency of participation with peers," he should "make efforts to get the girls to these activities (or at a minimum allow the other parent to do so)." Following Downing's decision, Dr. Missar spoke with M.D. and E.D. about their interest in Girl Scouts and both of them indicated that they "liked participating in Girl Scouts. They had friends who were in Girl Scouts. They like some of the

activities in Girl Scouts. . . . [And] [b]oth expressed some upset . . . about not participating in Girl Scouts on an ongoing basis." Likewise, Perry testified that, when she informed E.D. that she could not attend GOTR that year, E.D. became "distraught, very upset."

Downing first testified that he thought the girls would be overly scheduled if they participated in either activity, and that there would be "logistical challenges," given that Downing and Perry were divorced. Yet, later, Downing clarified that Girl Scouts had only "one to two scheduled" events per month, and conceded that he did not know whether M.D. was actually signed up for *any* extracurricular activities at present, and that E.D. only had weekly tutoring sessions. In fact, Perry testified that M.D. was not signed up for any extracurricular activities, and Dr. Missar opined that the girls were involved in a "below average" number of activities for children of their age. On cross-examination, Downing gave a different reason for disallowing these activities, explaining that he did not approve any activities for the girls on Perry's custodial time because Perry had started taking E.D. to a few Girl Scouts meetings without first "following the process," i.e., the 2012 agreement, which required the consent of both parents. It appears that Downing likewise prevented the girls from attending GOTR because Perry had reserved slots for both girls on GOTR without his prior consent. According to

Downing, he "wasn't going to agree to that kind of underhanded leveraging behavior."

Dr. Missar's testimony bolstered the trial court's subsequent conclusion that Downing's decision to prohibit the girls from attending the extracurricular activities was premised more on his mistrust of Perry and his patterned negative response towards Perry's suggestions. Specifically, Dr. Missar testified that Perry approached him for advice on how to present the possibility of having the girls participate in Girl Scouts and GOTR, since both girls have "longstanding friendships" with individuals in these activities, and that "she saw them as reasonable after-school activities that would be beneficial for the girls." Dr. Missar counseled Perry to couch the suggestion as if it came from the girls because Downing "react[s] very strongly against things that [Perry] suggest[s] on her own initiative."

### C. Trial Court's Decision

In a thorough and detailed seventy-four page order, the trial court denied Downing's motion for sole legal and primary residential custody of the children. The trial court granted Perry's request that Downing's tie-breaking authority over

legal custody disputes be removed and instead vested in the FTC. Perry made this request in her opposition to Downing's motion for sole legal custody, which the court construed as a cross-motion request. The trial court concluded that Perry had demonstrated a "material change in circumstances because she had not anticipated [Downing's] . . . consistent rejection of each recommendation made by Dr. Missar regarding the minor children's extracurricular activities."

The trial court further observed that Downing abused his tie-breaking authority, especially as it relates to denying requests for M.D. and E.D. to participate in extracurricular activities. Specifically, the trial court found that Downing's "desire for total control and veto power over the minor children, drove him to unreasonably reject activities that could enhance the minor children's lives[,]" in reference to Girl Scouts and GOTR. The trial court also considered the "mosaic of the family dynamics" and found that Downing "has never utilized his tie-breaking authority to make a final decision that was not in keeping with [his] initial decision before receiving Dr. Missar's recommendation." The court admonished Downing for effecting *de facto* sole legal custody over the children, even though the 2012 agreement did not provide Downing with "unilateral authority to make legal custody decisions," nor did it grant Downing "the right to make final decisions regarding the minor children's general welfare when the FTC

process ha[d] not been engaged by the parties." Lastly, the court credited Dr. Missar's expert opinion that "neither party should have tie-breaking authority in a high conflict case such as this one."

Ultimately, the court concluded that the current framework was "not workable and [was] **not in the best interest of the minor children**," (emphasis added), and that "[t]he parties' long history of an inability to communicate to reach joint decisions on most matters concerning [the children's] general well-being" required the court to vest "the tie-breaking authority in the [FTC] and remov[e] it from [Downing]."[8] *See generally Johnson v. United States*, 398 A.2d 354, 361 (D.C. 1979). Accordingly, the trial court ordered that the FTC "shall have tie-breaking authority regarding legal custody matters on which the parties cannot reach an agreement," thereby superseding the FTC provisions granting Downing that right in the 2012 agreement. This appeal followed.

---

[8] The trial court also took into consideration Downing's breaches of certain notification provisions of the prior 2009 Consent Custody Order that was incorporated into the 2012 agreement. Specifically, the trial court concluded that Downing had at times failed to timely notify Perry regarding the children's travel schedule and medical/injury issues. The court concluded that Downing's conduct in this regard was further evidence of the "historical and ongoing problems of the parties' inability to communicate appropriately regarding the minor children, as well as [Downing's] view that he had final decision[-]making authority even outside of the context of the [FTC] process."

## II. Tie-Breaking Authority

This court "will only reverse a trial court's order regarding child custody upon a finding of manifest abuse of discretion." *Jordan v. Jordan*, 14 A.3d 1136, 1146 (D.C. 2011) (citation and internal quotation marks omitted). Moreover, the trial court's rulings "come to us with a presumption of correctness." *Hutchins v. Compton*, 917 A.2d 680, 683 (D.C. 2007) (citation and internal quotation marks omitted). The exercise of judicial discretion, however, must be grounded "upon correct legal principles and must rest on a firm factual foundation." *Wilkins v. Ferguson*, 928 A.2d 655, 666-67 (D.C. 2007) (quoting *In re T.L.*, 959 A.2d 1087, 1090 (D.C. 2004)). Accordingly, "[w]e review a trial court's legal determinations *de novo* but apply a clearly erroneous standard to its findings of fact." *Jordan*, *supra*, 14 A.3d at 1146.

On appeal, Downing argues that the trial court abused its discretion in modifying custody by taking away his tie-breaking authority and awarding it to the FTC. Downing makes two arguments in this regard. First, Downing argues that there was no material change in circumstances justifying the trial court's decision to modify custody. Downing's second claim, which we only briefly address, is

that the court abdicated its responsibility to decide "core issues" of legal custody, and instead conferred those rights onto the FTC.

### A. Change in Circumstances

We have explained that "the court can modify [custody arrangements] . . . if it finds (1) that there has been a change in circumstances which was not foreseen at the time the agreement was entered, and (2) that the change is both substantial and material to the welfare and best interest of the children." *Foster-Gross v. Puente*, 656 A.2d 733, 737 (D.C. 1995);[9] *see also* D.C. Code § 16-914 (f)(1). The burden

---

[9] To determine the best interest of the child, the trial court looks to D.C. Code § 16-914 (a)(3), which states:

> In determining the care and custody of a child, the best interest of the child shall be the primary consideration. To determine the best interest of the child, the court shall consider all relevant factors, including, but not limited to: (A) the wishes of the child as to his or her custodian, where practicable; (B) the wishes of the child's parent or parents as to the child's custody; (C) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest; (D) the child's adjustment to his or her home, school, and community; (E) the mental and physical health of all individuals involved; (F) evidence of an intrafamily offense . . . ; (G) the capacity of the parents to communicate and reach shared decisions

(continued…)

of proof is on the party seeking the modification, and is by a preponderance of the evidence. *See* D.C. Code § 16-914 (f)(2). On this record, we conclude that Perry satisfied her burden of proof by a preponderance of the evidence that a substantial and material change in circumstances warranted the trial court's removal of Downing's tie-breaking authority and instead vesting that power in the FTC.

### 1. Material Change in Circumstances

We must first determine whether there was an unforeseen material change in circumstances before deciding whether modification of the custody arrangement would be in the best interest of the children. *See Foster-Gross*, *supra*, 656 A.2d at 737. It is well-documented that Downing and Perry had a fractious relationship

---

(…continued)
affecting the child's welfare; (H) the willingness of the parents to share custody; (I) the prior involvement of each parent in the child's life; (J) the potential disruption of the child's social and school life; (K) the geographic proximity of the parental homes as this relates to the practical considerations of the child's residential schedule; (L) the demands of parental employment; (M) the age and number of children; (N) the sincerity of each parent's request; (O) the parent's ability to financially support a joint custody arrangement; (P) the impact on Temporary Assistance for Needy Families, or Program on Work, Employment, and Responsibilities, and medical assistance; and (Q) the benefit to the parents.

that affected their ability to make legal custody decisions for their children. Downing repeatedly sought full custody of the children, accusing Perry of sabotaging his relationship with the girls and unilaterally making decisions on their behalf, even though the parties had equal legal rights. In particular, the record reflects that Downing's biggest concern and source of discord was Perry's supposed circumvention of his consent in signing the children up for extracurricular activities. Consequently, in this context, the former Guardian *ad litem*, Desjardins, explained that the 2012 agreement, which gave Downing tie-breaking and therefore final decision-making authority, was an attempt on her part to reduce conflict and "relax" Downing, so that he would "feel more comfortable authorizing things [i.e., activities] for the children." Downing corroborated this sentiment, claiming he initially felt "a great sense of relief." Likewise, Perry testified that she expected that a neutral FTC would help her and Downing communicate better, thereby allowing Downing to "make decisions in the best interest of [the] children."

The expectations of the parties in entering the 2012 agreement, i.e., the FTC process in which Downing had tie-breaking authority would improve communications and increase the children's extracurricular activities, were clearly not met. Notably, while it is undisputed that the girls previously attended both

GOTR and Girl Scouts, once Downing received tie-breaking authority, he suddenly disallowed both activities, which left the girls with — in Dr. Missar's expert view — a "below average" number of activities. In fact, other than tutoring, it does not appear that the children were involved in any extracurricular activities at all. Downing precluded the girls from attending, despite Perry's wish that they participate, and despite Dr. Missar's recommendation that they participate on the basis that such activities would ensure "their consistency of participation with peers," and was thus in their best interests.[10]

Downing's refusal was unreasonable — he explained that he refused these activities, which he himself characterized as "great" or "good" activities, because Perry did not follow the "process" of asking for his consent first. Downing's reason for disallowing these activities was more about his issues with Perry and his

---

[10] Our dissenting colleague argues that there was no material change in circumstances here because the parties' relationship had been contentious both before and after the 2012 agreement, and that Perry should have foreseen that by giving Downing tie-breaking authority he could reject her and the FTC's recommendations on day-to-day legal custody matters. *Post* at 35-36. Yet, the dissent's argument is explicitly belied by the record evidence, which shows that one of the primary and specific reasons the parties entered into the 2012 agreement was so that Downing would feel more comfortable in allowing the girls to participate in *more* extracurricular activities. *See supra* at 18. Not only did that not happen, the girls actually participated in *fewer or no* extracurricular activities following the agreement. Neither of the parties had foreseen this result when they entered into the 2012 agreement.

patterned negative response to her suggestions, and does not promote the best interests of the children. Further, the hope that the 2012 agreement would lead to better communication between Perry and Downing was also unrealized. Downing failed to ever use his tie-breaking authority in a manner inconsistent with his original position, and essentially acted as if he had *de facto* sole legal custody of the children.

The trial court found that Perry had established by a preponderance of the evidence that there had been a material change in circumstances because Perry "had not anticipated [Downing's] undisputed, consistent, rejection of each recommendation made by Dr. Missar regarding the minor children's extracurricular activities." *See also Wilson v. Craig*, 987 A.2d 1160, 1164 (D.C. 2010) (concluding that there was a material change in circumstances where the trial court found that the parties had entered into the agreement expecting a reduction in hostilities, but that the conflict had instead continued and escalated). The record supports the trial court's findings and conclusion, and we discern no error.

In *Wilson v. Craig*, we similarly concluded that the trial court did not err in finding an unforeseen material change in circumstances justifying a modification

in custody. In that case, the parties had entered into a custody arrangement hoping that it would moderate the child custody disagreements between the parents, improve the contentious relationship between the parents, and reduce hostility of the parents towards each other. *Id.* at 1164. In *Wilson*, we concluded that the trial court did not abuse its discretion in concluding that an unforeseen material change was established where the conflict between the parties had "escalated" since the execution of the agreement. *Id.* Similarly, in this case, the trial court did not err in concluding that Perry could not have foreseen that Downing would use his tie-breaking authority to exercise *de facto* sole legal custody over the children by precluding Perry from exercising her equal rights as a co-parent and by blocking even *more* of the children's extracurricular activities than before.

## 2. Best Interest of the Children

Further, the record reflects that Downing's rejection of the girls' extracurricular activities had a material impact on the children's well-being. In particular, Dr. Missar noted in his recommendation that the girls should participate in Girl Scouts because it was important for the girls to have "consistency of participation with peers." The trial court also observed that the lack of

extracurricular activities plainly could have an adverse effect on the minor children's mental and physical well-being.

We are also mindful that this is a high-conflict child custody case, and the fact that Downing has never utilized his tie-breaking authority to make a decision contrary to his initial position. Such a result is not in the best interests of the children as it is tantamount to giving Downing *de facto* sole legal custody over the children. *See, e.g.*, *Jordan*, *supra,* 14 A.3d at 1159 (concluding that a parent's right to raise her children must be reconciled with the other parent's same interest, and with the principle that a biological parent's rights must ultimately give way before the children's best interest); *Prost v. Greene*, 652 A.2d 621, 627 (D.C. 1995) (concluding that conduct by one parent that "interferes with the fulfillment of [the] children's need for the guidance and love of the [other parent] may have a *serious effect on the welfare of the children*") (emphasis added).[11]

---

[11] The dissent argues that, unlike in *Wilson v. Craig*, where the conflict between the parents had escalated to such an extent as to cause the children to experience "psychological and emotional distress," there was no comparable harm to M.D. and E.D. here based on Downing's refusal for them to participate in extracurricular activities; our dissenting colleague points to the fact that, in many other respects, M.D. and E.D. were well-adjusted and happy. *Post* at 36-37. We disagree. The standard for modifying custody is not whether the children are necessarily "harmed" or are in eminent danger by the unforeseen change in circumstances, but simply whether the unforeseen change was "substantial and material to the welfare and best interest of the children." *Foster-Gross*, *supra*, 656

(continued…)

The trial court analyzed whether tie-breaking authority should be taken away from Downing based on the "best interests of the child" statutory factors. *See* D.C. Code § 16-914 (a)(3); *supra* note 9. In concluding that the best interest of the children favored removing Downing's tie-breaking authority, the trial court focused on the fractious nature of the parents' relationship and Downing's abuse of his tie-breaking authority. In particular, Downing's "unreasonable" decision to exclude the girls from Girl Scouts and GOTR, which the court found was based more on his need for control than him seeking to enhance the children's lives, and Downing's use of the tie-breaking power to make "unilateral" decisions regarding legal custody matters. *See generally* D.C. Code § 16-914 (a)(3)(G) ("[T]he

---

(…continued)

A.2d at 737. As the trial court found, Downing's consistent rejection of the girls' participation in extracurricular activities (especially during such crucial formative years) constituted a substantial and material change in circumstances that negatively affected the girls' best interest. Dr. Missar himself noted that such activities were important because they allowed the girls to have "consistency of participation with peers," or in more plain-spoken language: it is important for teenage girls to participate in activities with their friends for social development. In our view, this is not inconsequential to the best interests of the children.

Further, we emphasize that it is also important to look at this case as a whole, rather than simply focusing on Downing's decision regarding Girl Scouts and GOTR. A pattern had developed demonstrating that Downing was using his tie-breaking authority as a form of *de facto* sole legal custody, even though both parties had equal rights. Further, there was evidence that Downing made decisions based more on his patterned negative response to Perry, sometimes in contravention to the children's best interests. Consequently, M.D.'s and E.D.'s best interests were not being served by allowing Downing to continue to have tie-breaking authority. *See supra* at 22, 23.

capacity of the parents to communicate and reach shared decision affecting the child's welfare[.]").  The court also considered Dr. Missar's expert testimony that neither party should have tie-breaking authority in a high-conflict case such as this. *See Wilson*, *supra*, 987 A.2d at 1165 (stating that the judge's findings were well-supported by expert testimony and by first-hand observation of the demeanor of the parties and witnesses).  Thus, in the trial court's view, the parties would benefit from continued joint legal and physical custody of the minor children, but with the FTC having tie-breaking authority regarding legal custody matters, "[g]iven [Downing's] past rigid exercise of his tie-breaking authority" which the court found was premised more on Downing's patterned negative response of Perry's suggestions, rather than making decisions in the children's best interest.  *See generally* D.C. Code § 16-914 (a)(3)(Q) ("[T]he benefit to the parents.").  Based on this record, we discern no abuse of discretion in the trial court's determination that it was in the best interests of the children to remove Downing's tie-breaking authority and vesting it in a neutral FTC.

Downing counters that the trial court's determination that he had failed to prove a change in circumstances for purposes of his motion for sole legal custody precluded the court from thereafter concluding that Perry, on the other hand, successfully proved a change in circumstances, supporting the court's decision to

divest Downing of his tie-breaking authority.  Downing argues that the trial court had observed the minor children to be "happy, well-adjusted socially, and . . . doing well in school."  We are unpersuaded by this argument.  As the moving party for sole legal custody, it was Downing's burden to prove that there was a material change in circumstances warranting giving him full legal custody of the children.  *See* D.C. Code § 16-914 (f)(2).  He failed to do that.  His failure does not thereafter preclude Perry from proving that Downing's behavior subsequent to the 2012 agreement constituted a different material change in circumstances warranting the removal of his tie-breaking authority.

Here, the trial court concluded that Perry had indeed proved by a preponderance of the evidence that Downing's tie-breaking authority was not in the children's best interests because he had unreasonably used this authority to preclude his daughters from joining beneficial extracurricular activities to their mental and physical detriment.  The record supports the trial court's findings that Downing's categorical rejection of all recommendations by the FTC after Downing was given tie-breaking authority constituted a material change in circumstances and not in the girls' best interest.

## B. Delegation of Authority

We next briefly address Downing's claim that the trial court's order erroneously delegated *all* final decision-making authority over legal custody matters, including the "core issues" of visitation and custody, to the FTC. We conclude that this argument is without merit.

In *Jordan*, we observed that, pursuant to Super. Ct. Dom. Rel. R. 53, the trial court is authorized "to delegate decision-making authority over *day-to-day* issues to [a] parenting coordinator [FTC]." 14 A.3d at 1156 (emphasis added). However, we clarified that the "court's ability to delegate authority to a special master or parenting coordinator has limits." *Id.* Specifically, "a trial court may not abdicate its responsibility to decide *the core issues of custody and visitation*[,]" because "[b]y statute, when custody of a child is disputed, the trial court must decide what type of custody arrangement is appropriate." *Id.* (citing D.C. Code § 16-914 (a)(1)(A)) (emphasis added). Thus, in *Jordan*, we approved the trial court's order which made clear that the parenting coordinator may "make decisions resolving day-to-day conflicts between the parties that *do not affect the court*'s *exclusive jurisdiction to determine fundamental issues of custody and visitation.*" *Id.* (emphasis in original).

Here, the trial court's order states the following:

> FURTHER ORDERED, that the Family Treatment Coordinator shall have tie-breaking authority regarding legal custody matters on which the parties cannot reach an agreement; the 2012 Consent Custody Order is modified by deleting paragraphs 2.iv. and 2.v. and 2.vii and all other provisions of the Order shall remain in [e]ffect[.]

The paragraphs of the 2012 order that the trial court deleted were essentially those that limited the FTC's authority to making a recommendation on a dispute for Downing's review and approval.[12]  Further, the trial court explicitly stated that "all other provisions of the [2012 agreement] shall remain in effect."

Paragraph 2.i. of the 2012 agreement, which remains in effect, clarifies that the FTC process will be utilized only where there is a dispute "regarding a legal custody decision *which impacts the health, education, religion or general welfare, including extracurricular activities, of the children*[,]" i.e., day-to-day matters.  In

---

[12]  Paragraph 2.iv:  "Once the FTC has made a recommendation, Mr. Downing will inform Ms. Perry within 48 hours of his decision."

Paragraph 2.v:  "Both parties agree that the FTC will not be asked to make decisions or have any tie-breaking authority.  The FTC will only make recommendations."

Paragraph 2.vii:  "Within four weeks of execution of this Agreement, each party shall provide Jamie Desjardins with two names of potential FTCs.  Ms. Desjardins shall then select the FTC."

other words, although the trial court's order modified custody by vesting the tie-breaking authority in the FTC, the FTC's decision-making powers are still expressly governed by the preserved portions of the 2012 agreement, which make clear that it is limited to disputes regarding day-to-day matters involving the children, and not the "core issues of custody and visitation." *Jordan*, *supra*, 14 A.3d at 1156.[13]

## III.   Other Issues

Downing raises three additional issues, which we can address more summarily. First, Downing argues that, because Perry only filed an opposition to his motion seeking sole legal custody, he was not on notice that she also sought

---

[13] Moreover, any residual confusion on this issue was explained away by Judge Irving in a later order denying Downing's motion to alter or amend the judgment. Specifically, Judge Irving clarified that "Judge Clark intended for the parties to make joint decisions concerning their children but, when a dispute ar[ises] regarding day-to-day issues justifying engagement of the FTC, that the FTC would have final decision making authority over continuing disputes stemming from his/her recommendation." Judge Irving further observed that "[a]uthority to determine custody or visitation would be beyond the scope of the FTC process, and it does not appear that the parties themselves would ever have had tie-breaking authority over such matters." As Judge Irving clarified the legal significance of the trial court's initial order modifying the 2012 agreement, Downing's attempt on appeal to argue to the contrary is without merit. *See, e.g.*, *Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) ("It is peculiarly within the province of [the trial court] . . . to determine the meaning of its own order." (citations and internal quotation marks omitted)).

removal of his tie-breaking authority. Consequently, he argues, the trial court's decision to grant Perry's request to remove his tie-breaking authority violated his due process rights. A related issue was raised by Downing's trial counsel prior to the start of the hearing in which he argued that Perry "simply opposed" Downing's motion for custody, and therefore "should be bound by [her pleading]." We are unpersuaded by this argument. The court's decision, while informed by the initial pleadings, was ultimately decided by looking to the evidence in the record. We conclude that Downing's argument on appeal is similarly without merit. As we stated in *Moore v. Moore*, 391 A.2d 762, 768 (D.C. 1978):

> Whether parties have impliedly contested a matter i.e., whether parties recognize that an issue not stated by the pleadings entered the case . . . is determined by searching the trial record for indications that the party contesting the amendment received *actual notice* of the injection of the unpleaded matters, as well as an adequate opportunity to litigate such matters and to cure any surprise from their introduction.

(Emphasis added) (Citations omitted). Here, the record demonstrates that Downing was on actual notice of Perry's request to remove his tie-breaking authority based on her proposed findings of fact and conclusions of law submitted to the court prior to the hearing. The first page of Perry's proposed order, which was available to both parties prior to the start of the hearing, made clear that Perry sought to revoke Downing's tie-breaking authority by stating that "the [c]ourt

modifies the current custody arrangement between [Downing] and [Perry] to eliminate [Downing's] tie-breaking authority . . . ." The fact that Downing's trial attorney raised the issue before the trial court prior to the hearing only further proves that he was on notice, and that he had ample opportunity to litigate the matter during the hearing.

Second, Downing argues that the trial court abused its discretion by refusing to consider the "overwhelming evidence" that favored him in rejecting his motion for sole legal custody. He points to former Guardian *ad litem* Desjardins's lay testimony in which she recommended that Downing be awarded sole legal custody, and FTC Dr. Missar's expert testimony in which he appeared to have placed more of the blame on Perry.[14]

While the "trial court may not arbitrarily disregard, disbelieve, or reject an expert's uncontradicted testimony . . . once there is some basis in the record for the judge's refusal to accept an expert's conclusion, we will not [substitute] our judgment against that of the finder of fact who saw and heard the witness testify."

---

[14] Specifically, in response to Downing's trial counsel's question, Dr. Missar, who was called by Downing as a witness, agreed that "[i]n terms of many of the circumstances that have been brought to [him] for specific addressing of conflict," Perry was "largely the problem in the dealings of these two people in making decisions about their children[.]"

*Prost*, *supra*, 652 A.2d at 629 (citations, internal quotation marks, and brackets omitted). Relatedly, it is well-established that "[a]n appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *In re S.G.*, 581 A.2d 771, 775 (D.C. 1990) (citation and internal quotation marks omitted).

Although admittedly there was some evidence that appeared to favor Downing, the trial court was well within its purview as the factfinder to discount or minimize Dr. Missar's and Desjardin's testimony favoring Downing based on ample contrary evidence in the record. Specifically, the trial court's order concluded that Downing had failed to show a substantial and material change in circumstances warranting giving him sole legal custody of the children primarily because none of his accusations levied against Perry, i.e., that she endangered the children, withheld medical treatment and information, and alienated Downing from the children, were substantially borne out by the evidence, and were rather essentially attempts by Downing "to make a mountain out of a mole hill." Further, in denying his motion, the trial court was also not blind to Downing's own behavior, which the trial court characterized as a "desire for total control and veto power over the children." Notably, the trial court weighed against Downing's motion his own failure to abide by the terms of the custody agreement,

such as his failure to timely notify Perry regarding any medical issues that arise with the children. Given this evidence, along with the many character witnesses who testified in favor of Perry's parenting and the trial court's conclusion that some of Downing's allegations were unreliable based on his own contradicted testimony, the trial court was well within its authority to deny Downing's motion for sole legal custody. Accordingly, we will not supplement our judgment for that of the trial court. *Prost*, *supra*, 652 A.2d at 629.

Third, Downing claims that the trial court erred in awarding Perry attorney's fees and costs totaling $18,111.02. His main argument is that Perry was represented on a pro bono basis and her retainer stated that the firm would "absorb its [internal costs] . . . and cover necessary [external costs] up to $2,500[,]" and therefore Perry was not entitled to fees and costs that she was not legally obligated to pay. This argument is without merit. Preliminarily, the 2012 custody agreement states that "[i]f either party is found to be in breach of this Agreement, the non-prevailing party will be responsible for the fees and expenses incurred by the other party relating to the breach." The contract obligates Downing to pay any attorney's fees incurred by Perry in defending her parental rights. *See Assidon v. Abboushi*, 16 A.3d 939, 942 (D.C. 2011). As we recently stated in *Saxon v. Zirkle*, 97 A.3d 568, 576 (D.C. 2014), "this court and others

have held that attorney's fees may be awarded even though representation was provided on a pro bono basis." Consequently, the fact that Perry was represented on a pro bono basis did not preclude her from being awarded attorney's fees and costs for the services that the firm had provided. *See, e.g.*, *Centennial Archaeology, Inc. v. AECOM, Inc.*, 688 F.3d 673, 679 (10th Cir. 2012) (observing that many "courts construe the term *attorney fees* to mean, not the amount actually paid or owed by the party to its attorney, but the value of attorney services provided to the party") (emphasis in original).

## IV. Conclusion

We affirm the trial court's decisions in all respects. The trial court did not abuse its discretion by modifying the custody agreement by removing Downing's tie-breaking authority and vesting it in the neutral FTC. Further, we see no error in the trial court's decision denying Downing's motion for sole legal custody, or in awarding Perry attorney's fees and costs. Accordingly, the order is

*Affirmed.*

GLICKMAN, *Associate Judge*, concurring in part and dissenting in part: Although I join the majority opinion in other respects, I would reverse the trial court's decisions to divest Mr. Downing of his tie-breaking authority with respect to custody disagreements and to give such authority to a Family Treatment Coordinator. A trial court may modify a voluntarily negotiated child custody agreement "only if it finds (1) that there has been a change in circumstances which was not foreseen at the time the agreement was entered, and (2) that the change is both substantial and material to the welfare and best interest of the children."[1] In my view the evidence of record does not support a finding that these conditions were met in this case.

In upholding the trial court's ruling, my colleagues agree with its conclusion that Downing abused his tie-breaking authority by his "consistent rejection of the FTC's recommendations in favor of his original position each time the tie-breaking process was utilized." *Ante* at 3. Supposedly, Downing "used his tie-breaking authority to "essentially effectuate '*de facto* legal custody'" over his daughters. *Id.*

---

[1] *Foster-Gross v. Puente*, 656 A.2d 733, 737 (D.C. 1995); D.C. Code § 16-914 (f)(1) (2012 Repl.) ("An award of custody may be modified or terminated upon the motion of one or both parents, or on the Court's own motion, upon a determination that there has been a substantial and material change in circumstances and that the modification or termination is in the best interest of the child.").

I think this is hyperbole. In point of fact, as my colleagues acknowledge, *ante* at 9, the record reflects only three instances in which Downing exercised his tie-breaking authority; and the trial court based its decision on only one of them, Downing's "unreasonable" objection to his daughters' participation in two extracurricular activities, Girl Scouts and Girls on the Run.[2] In my opinion, the record does not support a conclusion that Downing's actions on these occasions amounted to an unforeseen change of circumstances following the parties' 2012 custody agreement that was substantially and materially adverse to the welfare and best interest of the children.

First, there was no unforeseen change of circumstances. The relationship between Downing and Perry was contentious both before and after they entered into the 2012 agreement. There is nothing in the record to suggest that their relationship had changed for the worse.[3] Moreover, as my colleagues

---

[2] The issues on the other two occasions were whether his eleven-year-old daughter should receive the HPV vaccine, and whether the children should attend summer camp.

[3] In fact, the evidence suggests that the acrimony between the parties had declined somewhat. Dr. Missar, the Family Treatment Coordinator, testified that both parties were attempting to comply with his recommendations, and that the improvement in their relationship was "a work in progress." Despite a consistent pattern of contentious behavior, Dr. Missar perceived that the incidents of conflict between the parties were less dramatic following the 2012 agreement.

acknowledge, the involvement of the children in extracurricular activities was a principal "source of discord" even prior to the 2012 agreement.[4]  While Perry might have hoped that the 2012 agreement would lead to improved communications and reduce the conflict in this area, the fact remains that she expressly contemplated and agreed that Downing would have the final say, and that he would be free to reject her wishes and the Family Treatment Coordinator's recommendations with regard to the children's extracurricular activities.  It therefore cannot be maintained that Downing's exercise of the very authority Perry agreed to give him was an unforeseen change of circumstances.

Second, Downing's exercise of his tie-breaking power was not substantially and materially contrary to the welfare and best interest of the children.  This case is unlike *Wilson v. Craig*,[5] where this court upheld the modification of a custody agreement because of its unforeseen and seriously harmful consequences for the parties' children.  In that case, as the trial judge found, the parents had expected their agreement would reduce the conflicts between them, but instead "[t]he hostility had increased to an extent they had not anticipated and that was materially

---

[4]  *Ante* at 18 ("In particular, the record reflects that Downing's biggest concern and source of discord was Perry's supposed circumvention of his consent in signing the children up for extracurricular activities.").

[5] 987 A.2d 1160 (D.C. 2010).

affecting the welfare of the children."[6] Expert testimony established that the children were having trouble at school and had "discernible, definable, diagnosable conditions which … [made] it more difficult for them to cope" with the custody arrangements, and the court found that the children were experiencing "psychological and emotional distress."[7]

There is no evidence of comparable harm to the children in this case. Everyone who testified at trial said the children were happy, physically healthy, doing well in school, doing well socially, and (miraculously) unaware of the pending litigation. There was testimony that the girls participated in a below average number of extracurricular activities for children their age because Downing refused to allow them to participate in Girl Scouts and Girls on the Run. My colleagues call this refusal "unreasonable" and assert that his reason for disallowing the activities did "not promote the best interests of the children." *Ante* at 19-20. However, even if Downing's refusals were motivated by his consternation with Perry, the fact remains that there was no evidence to suggest

---

[6] *Id*. at 1164.

[7] *Id.* at 1162.

that his decisions were harming the children in any way, let alone substantially and materially.[8]

In sum, while it may have been unwise for the parties to agree to give Downing tie-breaking authority, I do not believe the trial court had the authority to change their agreement without a supportable finding of an unforeseen, substantial, and material change in circumstances. "A motion for modification ... is not to be used as a pretense to relitigate the equities of the prior decree."[9] Even if the trial court's modification *is* better for the children, that is not legally sufficient. We have held that the trial court cannot skip over finding an unforeseen, material change in circumstances, and move directly to fashioning a new custody arrangement based on a "best interest of the child" analysis.[10]

For the foregoing reasons, I respectfully dissent.

---

[8] Dr. Missar testified, in fact, that Downing's "decision-making abilities are very solid," and that in general he demonstrated "a very rational, logical assessment of [his daughters'] needs, how to intervene in them, how to provide for them, and make decisions in their best interests."

[9] *Graham v. Graham,* 597 A.2d 355, 357 n. 5 (D.C.1991).

[10] *Foster-Gross*, 656 A.2d at 737-38.